No. 96-203

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

ASH GROVE CEMENT COMPANY,
a Delaware corporation,

Plaintiff and Appellant,

v.

JEFFERSON COUNTY; and CHUCK NOTBOHM,
GLENNA OBIE and LEONARD WORTMAN,
the Commissioners of Jefferson County,

Defendants and Respondents.

APPEAL FROM: District Court of the Fifth Judicial District,
In and for the County of Jefferson,
The Honorable Robert J. Boyd, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John Alke (argued); Hughes, Kellner, Sullivan & Alke, Helena, Montana

For Respondents:

Valerie D. Wilson (argued), Jefferson County Attorney, Boulder, Montana

Argued: January 21, 1997
Submitted: February 21, 1997
Decided: July 23, 1997
Filed:

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Ash Grove Cement Company (Ash Grove) appeals from the order of the Fifth Judicial District Court, Jefferson County, granting summary judgment in favor of Jefferson County and the Jefferson County Commissioners and dismissing Ash Grove's complaint. We reverse and remand with instructions.

We restate the issues on appeal as follows:

1. Does state law prohibit Jefferson County from regulating air and water quality and siting hazardous waste facilities?

2. Did Jefferson County unlawfully establish the boundaries of a zoning district via adoption of the local vicinity plan for a portion of north Jefferson County?

3. Did Jefferson County properly adopt the local vicinity plan for a portion of north Jefferson County on either a stand-alone basis or as an amendment to, or partial repeal of, the comprehensive master plan?

FACTUAL AND PROCEDURAL HISTORY

Ash Grove owns and operates limestone quarries and a cement plant near Montana City, in Jefferson County. In recent years, substantial residential development in the area has resulted in increased enrollment at the Montana City School, located approximately one-half mile from Ash Grove.

In the spring of 1992, the Jefferson County Planning Board (Planning Board) began developing a comprehensive master plan (Master Plan) for Jefferson County. While the Master Plan was being developed, Ash Grove was considering burning hazardous waste in its dry fuel cement kiln and, in 1993, it filed applications for the necessary permits.

A group of Montana City residents opposed to Ash Grove's proposed burning of hazardous waste formed an organization called "Montanans for a Healthy Future" (MHF).

In November of 1993, numerous residents of Jefferson County, including members of the MHF, petitioned the Planning Board to include language in the Master Plan addressing the burning of hazardous waste. At some point thereafter, Ash Grove withdrew its applications for the permits to burn hazardous waste.

In response to concerns about Ash Grove's interest in burning hazardous waste, the Planning Board included language in the proposed Master Plan which would allow residents of each Jefferson County "community" or "vicinity" to work with it in developing planning and implementation programs consistent with the Master Plan. These local vicinity plans could include "performance standards" covering air pollution or the handling and disposal of hazardous waste.

The Jefferson County Board of Commissioners (County Commissioners) adopted the Master Plan by Resolution No. 46-93 in December of 1993 "for its jurisdictional area (the entirety of Jefferson County outside of the limits of the incorporated towns of Boulder and Whitehall)." Ash Grove's cement plant and mining quarries are located

within this jurisdictional area.

The "fundamental goal" of the Master Plan is to "help guide and manage community change to best serve its citizens' overall long-term interests." To that end, the Master Plan recognizes that three basic forces--economic, physical and social/cultural--shape all communities and that these forces must be considered together and balanced to best achieve the citizens' goals. The "Community Goals Statement" in the Master Plan summarizes the citizens' goals relating to each of these three forces; each goal is followed by a list of objectives meant to accomplish the goal. The goals and objectives set forth in the Master Plan are intended to guide future decision-making in planning and zoning decisions for the county.

Insofar as they relate to the present dispute between Ash Grove and Jefferson County, the Master Plan's stated goals and objectives seek to retain existing industries, support economic development throughout the county, preserve the county's scenic beauty and healthful environment and invite continued mineral exploration, extraction and refinement. The Master Plan recognizes that the culture and economy of Jefferson County historically have been dependent on land utilization and states, in this regard, that "Montana City is . . . the site of a plant that produces cement out of raw materials mined in the nearby vicinity."

The Master Plan classifies the area around the Ash Grove cement plant as "Mining and Industrial: Intensive Mineral Processing and Industrial Uses." The stated purpose of this land use classification is

> [t]o encourage the preservation of, continued use and expansion of these areas for mining, processing or industrial activities in a manner that will provide fair and reasonable protection of properties in nearby vicinities.

The Master Plan classifies the areas around Ash Grove's quarries as "Mining: Active Surface," with the stated purpose of

> encourag[ing] the maximum utilization of mineral resource areas currently being mined or planned to be developed for surface mining activities in a manner consistent with community protection objectives.

Over a period of nearly two years after formal adoption of the Master Plan in 1993, a group of residents from the Montana City area worked together with the Planning Board to develop a local vicinity plan for the specific area of northern Jefferson County in which Ash Grove is located. In the early stages, the local vicinity plan included proposed zoning regulations which prohibited the treatment, storage, disposal or incineration of hazardous waste within two miles of a school, residence or day care facility. The Jefferson County Planner subsequently noted numerous problems with the proposed zoning ordinance.

The County Commissioners then hired an attorney to review the proposed local vicinity plan and zoning ordinances. The attorney advised that the County Commissioners should adopt the local vicinity plan and zoning regulations sequentially rather than simultaneously. The proposed local vicinity plan was revised accordingly to delete the accompanying zoning regulations.

Jefferson County adopted the Local Vicinity Plan for a Portion of North Jefferson County (LVP) pursuant to Resolution No. 51-95 on September 26, 1995. The County Commissioners stated that they were amending the Master Plan via adoption of the LVP and that

to the extent that the Jefferson County Master Plan contains any provisions inconsistent with the Vicinity Plan, the Jefferson County Master Plan should be deemed amended, repealed and/or superseded by the provisions of the Vicinity Plan.

The LVP states that the area it covers has a "unique rural residential character" and is

home to active farms and ranches, residential subdivisions, neighborhood retail and commercial business operations, offices and professional uses, child care and day care facilities, school and other governmental uses and facilities.

Although Ash Grove also is located in the area, the LVP fails to mention industrial uses or mining.

One of the stated goals of the LVP is to create location standards for the placement of facilities which treat, store, dispose of or burn hazardous waste a certain distance from schools, day care facilities and residences. The LVP also sets forth goals for the preservation and enhancement of water and air quality and "[t]o plan for and guide future development in a manner consistent with the Jefferson County Master (Comprehensive) Plan."

Ash Grove challenged the validity of the LVP on numerous grounds in a declaratory judgment action brought against Jefferson County and its County Commissioners (collectively, Jefferson County) in October of 1995. Both Jefferson County and Ash Grove moved for summary judgment, the motions were fully briefed, and oral arguments were presented in February of 1996. The District Court subsequently granted Jefferson County's motion, denied Ash Grove's motion and dismissed the entirety of Ash Grove's complaint. Ash Grove appeals.

STANDARD OF REVIEW

Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. We review a district court's grant of summary judgment de novo, applying the same Rule 56(c), M.R.Civ.P., criteria used by that court. Matter of Estate of Lien (1995), 270 Mont. 295, 298, 892 P.2d 530, 532 (citation omitted). Ordinarily, such a review

requires that we first determine whether the moving party met its burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. See Estate of Lien, 892 P.2d at 532.

In this case, however, the dispositive facts surrounding the simultaneous adoption of the LVP and amendment of the Master Plan are undisputed. Through their cross motions for summary judgment, each party asserted entitlement to judgment as a matter of law. The District Court having granted Jefferson County's motion for summary judgment, we need only determine whether the court correctly concluded that Jefferson County is entitled to judgment as a matter of law. We review a district court's conclusions of law to determine whether the interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686 (citation omitted).

DISCUSSION

1. Does state law prohibit Jefferson County from regulating air and water quality and siting hazardous waste facilities?

Ash Grove argues that Jefferson County cannot regulate air and water quality or set siting requirements for hazardous waste facilities through adoption of the LVP because the authority to regulate these matters is vested exclusively in the State of Montana. On that basis, it contends that the LVP is preempted by the Montana Hazardous Waste and Underground Storage Tank Act, 75-10-401 through 75-10-451, MCA; the Clean Air Act of Montana, 75-2-101 through 75-2-123, MCA; and Montana's water quality laws, 75-5-101 through 75-5-1122, MCA.

The LVP sets forth the following goals and objectives:

To preserve and enhance water quality. . . .

To preserve and enhance air quality. . . .

. . . .

To create location standards requiring the placement of hazardous waste treatment, storage, disposal, and/or incineration facilities a certain distance away from schools, day care facilities and residences. . . .

The LVP does not implement these goals and objectives in any way, however, and, indeed, Jefferson County had not enacted any implementing ordinances, regulations or restrictions pursuant to the stated goals and objectives at the time of the oral argument in this case. We conclude, therefore, that Ash Grove's preemption argument is premature and we decline to address this issue on the merits.

2. Did Jefferson County unlawfully establish the boundaries of a zoning district via adoption of the LVP?

Ash Grove argues that, in adopting the LVP for the small portion of northern Jefferson County in which Ash Grove is located, Jefferson County established a zoning district, pursuant to which it intends to adopt and apply zoning ordinances, without meeting statutory requirements. Jefferson County agrees that the creation of zoning districts and adoption of zoning ordinances or regulations are controlled by statute. It

contends, however, that the LVP is a planning document adopted as an amendment to the Master Plan, rather than a zoning document, and, therefore, that the statutes governing zoning are irrelevant and inapplicable.

The establishment of zoning districts is governed by statute in Montana. A zoning district may be created under either 76-2-101et seq., MCA (commonly called Part 1 zoning), or 76-2-201 et seq., MCA (commonly called Part 2 zoning). Each statutorily-authorized method for creating zoning districts and enacting zoning regulations is separate and distinct from the other. See Petty v. Flathead County (1988), 231 Mont. 428, 432, 754 P.2d 496, 499.

Under 76-2-101, MCA, the county commissioners are authorized to create a planning and zoning district and appoint a zoning commission upon receipt of a petition to create a zoning district signed by sixty percent of the freeholders within the proposed district. The zoning commission then makes and adopts a development pattern for the physical and economic development of the planning and zoning district. Section 76-2-104, MCA. After notice and a public hearing, the county commissioners may adopt the development district and, thereafter, may adopt zoning regulations for the purpose of carrying out the development district. Sections 76-2-106 and 76-2-107, MCA.

Here, it is clear that the LVP is not a zoning district created pursuant to the statutory requirements for Part 1 zoning districts; none of the statutory prerequisites for a Part 1 zoning district was met in adopting the LVP. As a consequence, it is equally clear that the LVP cannot serve as the foundation for the adoption of zoning regulations under 76-2-107, MCA.

Sections 76-2-201 though 76-2-228, MCA, expressly apply in counties which have adopted a comprehensive master plan for their jurisdictional areas. In such a situation, the county commissioners may establish zoning districts and zoning regulations for all or part of the jurisdictional area covered by the master plan after requiring the county planning board to propose recommended boundaries and appropriate zoning regulations for the various zoning districts. Sections 76-2-202 and 76-2-204, MCA. Zoning regulations must be made in accordance with the master plan and pursuant to express statutory criteria and guidelines. Section 76-2-203, MCA. Part 2 zoning districts and regulations may be adopted only after specific statutory procedures are met, including notice of--and a public hearing on--both the proposed zoning district boundaries and the zoning regulations proposed for the district. See 76-2-205, MCA.

Here, although Jefferson County has adopted the Master Plan which could serve as the foundation for Part 2 zoning districts and regulations, it clearly did not follow Part 2 statutory procedures for the creation of a zoning district and zoning regulations

applicable thereto when it adopted the LVP. Indeed, Jefferson County concedes that it would be required to proceed under 76-2-201 et seq., MCA, in order to create zoning districts and zoning regulations in all or any part of the jurisdictional area covered by its Master Plan. Regardless of whether the LVP was properly adopted under the Master Plan or as part thereof, which we discuss below, the LVP relates to planning and not to zoning.

Accordingly, we conclude that Jefferson County did not unlawfully establish the boundaries of a zoning district via adoption of the LVP.

3. Did Jefferson County properly adopt the LVP on either a stand-alone basis or as an amendment to, or partial repeal of, the Master Plan?

Ash Grove argues that the LVP was not properly adopted on either a stand-alone basis or as an amendment to, or partial repeal of, the Master Plan. As a necessary foundation to our resolution of this issue, we first discuss Montana law relating to local government planning, the development and adoption of comprehensive master plans and the role of such plans in subsequent land use planning.

A local government may create a planning board--which serves in an advisory capacity--to promote the orderly development of governmental units and their environs. Sections 76-1-101, 76-1-102 and 76-1-106(1), MCA. In counties such as Jefferson County where a planning board has been created, the preeminent planning tool is the comprehensive jurisdiction-wide development plan called a master plan. See 76-1-106, 76-1-601 and 76-1-103(4), MCA. A master plan essentially surveys land use as it exists and makes recommendations for future planning; it may include maps and other descriptive materials which document the various land uses present within the jurisdictional area. Section 76-1-601, MCA.

The planning board is statutorily charged with preparing the master plan. Section 76-1-106, MCA. Prior to submitting the plan to the governing body for approval, it must provide notice and hold a public hearing. See 76-1-601 and 76-1-602, MCA. Thereafter, the planning board submits the proposed master plan to the governing body by means of a planning board resolution recommending the plan. Section 76-1-603, MCA. The governing body must then adopt a resolution of intention to adopt, revise or reject the proposed master plan. Section 76-1-604(1), MCA.

Once a master plan has been adopted, the governing body "shall be guided by and give consideration to the general policy and pattern of development set out in the master plan" in subsequent decision-making, including the adoption of zoning regulations. Section 76-1-605, MCA. Indeed, as discussed above, the statutes governing adoption of zoning regulations in a county which has a master plan are separate and distinct from those governing zoning in a county without a master plan. Cf. 76-2-201 et seq., MCA, with 76-2-101 et seq., MCA. In the former case, zoning regulations "shall be made in accordance with a comprehensive development plan. . . ." Section 76-2-203, MCA. Likewise, our prior decisions mandate that local governments consider and

adhere to the policies set forth in their comprehensive master plans in future land use planning decisions.

Bridger Canyon Property Owners' Assoc. v. Planning and Zoning Comm'n (1995), 270 Mont. 160, 890 P.2d 1268, involved an appeal by the Bridger Canyon Property Owners' Association (POA) from a district court order upholding the decision of the Planning and Zoning Commission (Commission) to approve a planned unit development (PUD) in Bridger Canyon. The POA argued, in part, that the Commission lacked authority to approve the PUD because the Bridger County Zoning Ordinance (Zoning Ordinance) under which the PUD was approved conflicted with the General Plan and Development Guide of Bridger Canyon (General Plan) and was inconsistent with the official zoning map for the area. Bridger, 890 P.2d at 1270-72. The respondents, which included the Commission as well as the corporation which had applied for the PUD approval, argued that the General Plan was exactly that, merely a general plan providing guidance for future land planning and development. Bridger, 890 P.2d at 1268, 1272-73.

We observed that the language used in the Zoning Ordinance expressly recognized the importance of the General Plan in the development pattern for Bridger Canyon and concluded, on that basis, that "it makes sense that the commissioners should be required

> to comply with the General Plan." Bridger, 890 P.2d at 1273. Indeed, to require no compliance at all would defeat the whole idea of planning. Why have a plan if the local government units are free to ignore it at any time?

Bridger, 890 P.2d at 1273-74 (following Little v. Board of County Comm'rs (1981), 193 Mont. 334, 631 P.2d 1282). We concluded that, while a comprehensive master plan need not be strictly complied with, a local government unit must at least substantially comply with the plan. Bridger, 890 P.2d at 1273-74 (citing Little, 631 P.2d at 1293). We further observed that

> [t]his standard is flexible enough so that the master plan would not have to be undergoing constant change. Yet, this standard is sufficiently definite so that those charged with adhering to it will know when there is an acceptable deviation, and when there is an unacceptable deviation from the master plan.

Bridger, 890 P.2d at 1274 (citing Little, 631 P.2d at 1293).

Both Bridger and Little involved the role of comprehensive master plans in zoning. However, the principles set forth therein regarding the importance of comprehensive master plans in future land use planning are equally applicable to our analysis here of the role of the master plan in the context of adopting a subsequent local vicinity plan. It is against this backdrop of Montana statutes controlling local government land use planning and our prior decisions that we scrutinize Jefferson County's adoption of the LVP both

on a stand-alone basis and as an amendment to, or partial repeal of, the Master Plan.

A. Adoption of the LVP on a Stand-Alone Basis

Ash Grove contends that, once Jefferson County adopted the Master Plan, all future planning and zoning, including the adoption of local vicinity plans, was required to be consistent with it. Ash Grove argues that the LVP is expressly inconsistent with the Master Plan. Jefferson County points out in response that, by its terms, the Master Plan authorizes and encourages local communities or vicinities to adopt local vicinity plans reflecting the unique character of the vicinity as a means of implementing the Master Plan and, therefore, that the LVP is entirely consistent with the Master Plan.

The Master Plan specifically recognizes Ash Grove's presence, and encourages industry and mining, while requiring a balancing between retaining mining and industry and preserving the area's scenic beauty and healthful environment. For example, the economic goal of the Master Plan is to "[s]ustain and strengthen the economic well-being of Jefferson County's citizens." One objective in fulfilling the Master Plan's economic goal is to

> [s]timulate the retention of existing and the development of new basic and value adding businesses and industries; especially . . . mining . . . and manufacturing/processing.

The Master Plan's physical goal is to "[p]rotect and maintain Jefferson County's rural character and the community's historic relationship with natural resource development." The following objectives set forth in the Master Plan are designed to accomplish this goal and recognize the importance of both mining and environmental considerations:

> Invite continued mineral exploration, extraction and refinement. . . .
> Preserve the County's scenic beauty. . . .
> . . . .
> Assure clean air, clean water, a healthful environment and good community appearance.

In addition, the Jefferson County Master Plan expressly recognizes the preeminent role assigned to it by the controlling statutes. It contains an Implementation Program for the purpose of systematically implementing its goals and objectives. One of the implementation strategies is the preparation of planning and implementation programs, called local vicinity plans, for the distinct areas within Jefferson County. To that end, the Master Plan states:

> By developing "vicinity" or "community" plans that are consistent with the County Comprehensive Plan, but which reflect the unique character of the

vicinities and their citizens, the County's diversity of places and people can be maintained and strengthened.

(Emphasis added.)

Similarly, the LVP at issue recognizes that the authority for the adoption of local vicinity plans derives solely from the foregoing language of the Master Plan by stating that "[t]hese Local Vicinity Plans must be consistent with the County Comprehensive Plan." It goes on, however, to describe the area it covers--including the Ash Grove property--as rural residential,

home to active farms and ranches, residential subdivisions, neighborhood retail and commercial business operations, offices and professional uses, child care and day care facilities, school and other governmental uses and facilities.

In doing so, the LVP not only ignores both Ash Grove's physical presence and the Master Plan's classification of the area around Ash Grove's cement plant and quarries as mining and industrial, but purports to change the classification to a designation totally at odds with that contained in the Master Plan.

Thus, the LVP is clearly inconsistent with the Master Plan and violates the mandate of that Plan which authorizes local vicinity plans only to the extent they are consistent with the Master Plan and designed to implement it. Likewise, the LVP also violates the spirit and language of 76-1-605, MCA, which requires the County Commissioners to "be guided by and give consideration to the general policy and pattern of development" set forth in the Master Plan in future land use planning such as zoning. Indeed, "[i]f the master plan is important enough to be a condition precedent to permanent zoning, it is also important enough to be followed once it is in existence." Bridger, 890 P.2d at 1274 (citing Little, 631 P.2d at 1293). We conclude that the County Commissioners failed to substantially comply with the Master Plan in adopting the LVP and, therefore, the LVP was not properly adopted on a stand-alone basis.

B. LVP as an Amendment to, or Partial Repeal of, the Master Plan

Ash Grove argues that Jefferson County cannot amend, revise or repeal the Master Plan via adoption of the LVP for the small area described therein. Jefferson County contends, on the other hand, that 76-1-604(3), MCA, authorizes it to revise or repeal the Master Plan or any parts thereof and that it properly did so via adoption of the LVP. In that regard, Jefferson County directs our attention to Resolution No. 51-95, by which it adopted the LVP, and which states that

to the extent that the Jefferson County Master Plan contains any provisions inconsistent with the Vicinity Plan, the Jefferson County Master Plan should be deemed amended, repealed and/or superseded by the provisions of the Vicinity Plan.

It is true that 76-1-604, MCA, authorizes governing bodies to revise or repeal a master plan. Jefferson County's purported amendment to, and partial repeal of, the Master Plan via adoption of the LVP, however, is problematic in three regards.

As discussed above, 76-1-601, MCA, provides that a master plan may include a survey of existing land uses; where such a survey is included, it must be based on careful and comprehensive studies of the existing conditions in the area. Jefferson County included such a factually-based land use inventory in the Master Plan which necessarily recognized the use of Ash Grove's property for mining and industrial purposes. The purported amendment of the Master Plan via adoption of the LVP, which effectively reclassifies Ash Grove's property from mining and industrial to rural residential, no longer meets the requirement that existing land uses be reflected in a master plan. The LVP's classification of the land within it, which includes Ash Grove's cement plant and quarries, as rural residential clearly is not based on the existing condition and use of the land as contemplated by 76-1-601, MCA. Because the LVP disregards the actual use of the land to which it purports to apply, it is not a proper amendment to the Master Plan.

Moreover, as discussed above, a master plan is a plan for the entire jurisdictional area. See 76-1-601, MCA. While 76-1-604, MCA, authorizes revision of a master plan, nothing in that statute supports the notion that revisions can be made which alter the master plan's inherent jurisdiction-wide nature and result in a patchwork plan for the jurisdictional area. Indeed, "[i]f the plan can be amended piecemeal, . . . the role of the plan as a comprehensive statement of community planning policies may be diluted and the planning process may be abused." Daniel R. Mandelker, The Role of the Local Comprehensive Plan in Land Use Regulation, 74 Mich. L. Rev. 899, 946 (1976). Jefferson County's effort to adopt the LVP, as an amendment to the Master Plan for only a small portion of the jurisdictional area covered by the Plan, simply undermines the importance of comprehensive planning recognized in Montana statutes and our decisions.

Finally, and as previously noted, 76-1-604, MCA, permits a governing body to repeal a master plan. Jefferson County contends that, in adopting the LVP via Resolution No. 51-95, it repealed portions of the Master Plan inconsistent with the LVP as authorized by the statute. The problems associated with such a generic and imprecise partial repeal are obvious and further demonstrate the dangers inherent in failing to accord a comprehensive master plan its proper role.

If Jefferson County's attempt to partially repeal the Master Plan by adoption of the LVP for only a small portion of the jurisdictional area is allowed to stand, how does one discern what is left of the Plan? What of the Master Plan's requirement, which reflects the spirit and intent of 76-1-605, MCA, and Bridger, that local vicinity plans be consistent with--and developed to implement--the Master Plan? Does adoption of a

local vicinity plan inconsistent with the Master Plan--like the LVP at issue here--repeal the requirement that local vicinity plans be consistent with the Master Plan, with the result that other vicinities also are free to disregard the Master Plan? Or does the requirement for consistent local vicinity plans remain applicable to other "vicinities" in Jefferson County which have not yet developed local vicinity plans? If implementation steps and planning which are necessarily subordinate to the goals and objectives of the Master Plan can be inconsistent with the Master Plan and used to partially repeal it, what becomes of the Master Plan as the preeminent planning device? Section 76-1-604, MCA, simply does not contemplate the use of a document required by the Master Plan and by Montana law to be a subordinate implementing device to override the Master Plan itself in the guise of a partial "repeal."

We conclude that Jefferson County's adoption of the LVP is neither a proper amendment to, nor a proper partial repeal of, the Master Plan. Having concluded above that the LVP also was improperly adopted on a stand-alone basis, we hold that the District Court erred in concluding that Jefferson County was entitled to judgment as a matter of law on the basis that it properly adopted the LVP pursuant to 76-1-604, MCA, and in granting its motion for summary judgment on that basis.

In the usual summary judgment case in which we reverse a district court's grant of summary judgment, that resolution is based on our conclusion that genuine issues of material fact exist which preclude the moving party's entitlement to judgment as a matter of law. Under such a circumstance, a reversal necessitates a remand for trial in which the factual issues will be determined by the trier of fact. Where all of the facts bearing on the resolution of the legal issues are before us, however, this Court may reverse a district court's grant of summary judgment and direct it to enter summary judgment in favor of the other party. See Matter of Estate of Langendorf (1993), 262 Mont. 123, 128, 863 P.2d 434, 438; Duensing v. Traveler's Companies (1993), 257 Mont. 376, 386, 849 P.2d 203, 210.

As stated above, the dispositive facts regarding Jefferson County's adoption of the LVP are undisputed. We concluded that Jefferson County improperly adopted the LVP either on a stand-alone basis or as an amendment to, or partial repeal of, the Master Plan. Based on those conclusions, we hold that Ash Grove is entitled to summary judgment on the invalidity of the LVP.

Reversed and remanded to the District Court for entry of summary judgment in favor of Ash Grove.

/S/ KARLA M. GRAY

We concur:

/S/ J. A. TURNAGE
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice W. William Leaphart and Justice James C. Nelson, specially concurring.

We specially concur in the decision of the Court. In quoting Daniel R. Mandelker, The Role of the Local Comprehensive Plan in Land Use Regulation, 74 Mich. L. Rev. 899, 946 (1976), the Court recognizes that, if the comprehensive plan can be amended piecemeal, the plan as a comprehensive statement of community planning may be diluted and the planning process may be abused. The present case presents a situation in which the party opposing the piecemeal amendment is a corporate entity which owns a cement plant and has, in the past, engendered public disfavor by proposing the burning of hazardous waste. Resolution of the legal issue presented, however, does not hinge upon whether the proponent is wearing a black or white hat. If, as respondents contend, we approve the piecemeal amendment of a comprehensive master plan through the adoption of inconsistent local vicinity plans, we would establish a very dangerous precedent. An influential special interest or corporate entity could, for example, utilize the local vicinity plan, piecemeal amendment process to establish a feedlot in an area previously designated by the comprehensive master plan as "residential."

Although the law allows for the amendment of comprehensive master plans, it does not envision piecemeal amendment or partial repeal through the adoption of junior documents which are inconsistent with the "master" plan. The sort of "comprehensive plan" at issue here is, in truth, the very antithesis of that which is contemplated by Montana's planning laws. It invites avoidance of what the law requires--a well thought out, long range, detailed and comprehensive planning document that takes into consideration past, present and anticipated land uses throughout the jurisdiction and which is debated and adopted in an atmosphere that is free, to the extent possible, from the influence of special interests and political expedience.

If the sort of "comprehensive planning" that is at issue here is lawful, then there is nothing to prevent a local government from adopting a "master plan" that is, as a practical matter, meaningless in its generality and then allowing the "plan" to be fleshed out via a crazy quilt of local "amendments" and partial repeals which, if history is

any guide, will reflect, not the beneficial criteria and high purposes specified in 76-1-102, MCA, but, rather, the alliance of special interest, money and politics.

Assuming that this local vicinity plan amends the master plan, what is the status when the next inconsistent local vicinity plan is adopted? Does LVP number two take precedence over the master plan and LVP number one? If the "master" plan is to be truly comprehensive, then its provisions, and its amendments, must be adopted from the top down, with an eye on the big picture. The master plan is no longer "comprehensive" when it is amended through adoption of inconsistent provisions in one or more local vicinity plans.

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON

Justice Jim Regnier, dissenting.

I agree with the majority's opinion on Issues 1 and 2; however, I disagree with the majority on Issue 3 and respectfully dissent.

The majority concludes that the Local Vicinity Plan for the north portion of Jefferson County, which was adopted by resolution on September 26, 1995, unlawfully repeals the Jefferson County Master Plan. The Jefferson County Board of Commissioners adopted the Local Vicinity Plan on September 26, 1995, in compliance with 76-1-604, MCA. Section 76-1-604, MCA, provides, in part:

> (1) The governing bodies shall adopt a resolution of intention to adopt, revise, or reject the proposed plan or any of its parts.
>
> . . . .
>
> (3) The governing bodies may adopt, revise, or repeal a master plan under this section.

This statute gives the Board, as a matter of law, the authority to adopt, revise, or repeal the Master Plan, or any of its parts. The Board acted within its statutory authority when it adopted the Local Vicinity Plan which resulted in a revision of the Master Plan.

The majority relies upon our decisions in Bridger and Little in reaching their decision. In my view, both cases are distinguishable. In Little, we noted that the Flathead County Board of Commissioners, which was involved in adopting zoning for a tract of land on which a shopping mall was proposed to be built, was required to substantially adhere to the master plan for the area, which established medium density residential use. The commissioners in that case essentially ignored the master plan which prohibited the type of proposed commercial development in the area which was designated for residential use. In Little, we stated: "We are aware that changes in the

master plan may well be dictated by changed circumstances occurring after the adoption of the plan. If this is so, the correct procedure is to amend the master plan, rather than to erode the master plan by simply refusing to adhere to its guidelines." Little, 193 Mont. at 354, 631 P.2d at 1293.

Bridger, which was also a zoning case, involved an appeal from a district court order upholding the decision of the planning and zoning commission to approve a planned unit development in Bridger Canyon. The Bridger Canyon Property Owners argued that the commission lacked authority to approve the PUD because the zoning ordinance under which that PUD was approved conflicted with the general plan and development guide of Bridger Canyon. In Bridger, we held that the commissioners were required to comply with the general plan when adopting zoning ordinances. Bridger Canyon Property Owners' Assoc. v. Planning and Zoning Comm'n (1995), 270 Mont. 160, 175, 890 P.2d 1268, 1277.

In neither Bridger nor Little did the county commissioners amend or revise the master plan but, rather, attempted to adopt zoning ordinances which were inconsistent and conflicting with the master plan. In the present case, the Jefferson County Board of Commissioners adopted a local vicinity plan and specifically revised the master plan by including language that any provisions inconsistent with the vicinity plan would be "deemed amended, repealed, and/or superseded by the provisions of the Vicinity Plan." In revising the Master Plan, the Board followed the procedure we stated was necessary in Little.

It is also important to note that the Jefferson County Board of Commissioners was not acting independently of the Jefferson County Planning Board. Unlike Little, where the commissioners adopted a resolution of intent without involving the planning board, the Local Vicinity Plan adopted by the Jefferson County Board was the result of an extensive process. It included public hearings before the Jefferson County Planning Board which ultimately recommended the adoption of the Local Vicinity Plan. This process also included a lengthy period of public comment before the Local Vicinity Plan was ultimately adopted by the Board of Commissioners.

The majority is concerned that the procedure followed in this instance may potentially result in piecemeal revisions of the Master Plan, until ultimately the Master Plan becomes a meaningless document. This may certainly occur. However, demographics change and the Legislature provided for a statutory framework which allows for master plans to be revised and changed to accommodate both population changes and resulting land use decisions. The Jefferson County Board followed this framework when it adopted the Local Vicinity Plan.

In summary, this is not a case where the commissioners adopted a zoning ordinance without input from the planning board or in contradiction with the master plan. It is an amendment to the master plan which the commissioners have authority to make.

The Board acted entirely within its statutory authority, as the District Court so found.

Therefore, as to Issue 3, I would affirm the decision of the District Court.

/S/ JIM REGNIER

Justice Terry N. Trieweiler and Justice William E. Hunt, Sr., join in the foregoing dissent of Justice Jim Regnier.

/S/ TERRY N. TRIEWEILER
/S/ WILLIAM E. HUNT, SR.

Justice Terry N. Trieweiler, dissents as follows:

I agree with the concurring and dissenting opinion of Justice Regnier.

In response to the concurring opinion of Justices Leaphart and Nelson, I wish to point out that while I agree with the public policy arguments made therein, I can find no statutory basis for imposing those requirements on Jefferson County. Section 61-1-604, MCA, authorizes the governing body to "revise" its master plan. That statute does not limit the nature nor extent of revision as the majority would require. The majority has simply substituted its judgment for that of the legislature.

For these reasons, while I share the majority's concern about the negative impact of piecemeal revision, I can find no statutory basis for doing anything about it.

Furthermore, my conclusion about what appears to be very plain language in 61-1-604, MCA, has nothing to do with whether the proponent of revision to the master plan is "wearing a black or white hat."

While the concurring opinion makes a lot of sense from a land use planning point of view it simply finds no basis in the statutory law pertaining to master plans.

For these reasons I dissent from the majority opinion.

/S/ TERRY N. TRIEWEILER