No. 99-228

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 42

298 Mont. 328

995 P. 2d 972

AMY DESERLY,

Plaintiff and Appellant,

v.

DEPARTMENT OF CORRECTIONS,

STATE OF MONTANA,

Defendant and Respondent.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Edmund F. Sheehy, Jr., Cannon and Sheehy, Helena, Montana

For Respondent:

Matthew A. Robertson, Special Assistant Attorney General, Department of Corrections, Helena, Montana

Submitted on Briefs: September 2, 1999

Decided: February 15, 2000

Filed;

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1.Amy Deserly (Deserly) appeals from the District Court's order dated March 5, 1999, on cross-motions for summary judgment. The court granted the Department of Corrections' (DOC) motion and denied Deserly's. We affirm.

## Background

¶2.In June 1996, Deserly filed suit in Lewis and Clark County against the DOC requesting unspecified damages for emotional distress allegedly caused when DOC's Montana State Prison (MSP) officers required her to submit to a strip search when she visited her husband, an inmate at the MSP, in January 1994. Deserly complained that her privacy was invaded and that she was humiliated and "visually raped" as a result of the search. DOC answered, denying Deserly's allegations.

¶3.A trial date was set for September 14, 1998. However, at the close of discovery, the parties agreed to vacate the trial date as there were no material disputed facts to submit to a jury. The parties further agreed to submit cross-motions for summary judgement. In due course, following oral argument, the District Court issued its decision in favor of DOC and against Deserly. Judge Jeffery Sherlock concluded that Deserly's privacy was not invaded by the strip search which was reasonably justified. Deserly timely appealed.

¶4.The material, undisputed facts underlying Deserly's cause of action, based upon the pleadings and fruits of discovery, include the following. Deserly traveled to the MSP on or about January 19, 1994, to visit her husband, who was then an inmate. She had visited her husband at MSP many times prior to this occasion. After completing the necessary paperwork for her visit, Deserly attempted to pass through the metal detector. However,

she set off the alarm indicating the presence of metal on her person. As she had in the past, Deserly was wearing an underwire bra, and, accordingly, informed the MSP officer on duty that the bra was triggering the metal detector. While MSP's inmate visiting policy required that female visitors wear a sport, regular, or strapless bra at all times, the policy did not, at that time, prohibit the wearing of an underwire bra.

¶5.The officer instructed Deserly to pass through the detector again, but this attempt, likewise, failed. Deserly then attempted to pass through the detector sideways but was informed that she could not pass through the metal detector in this manner. A final attempt by Deserly also failed.

¶6.At this point the MSP officer informed Deserly that she could consent to a strip search. She was also informed that if she refused the strip search, she would be denied contact visitation but would be allowed non-contact visitation.

¶7.Deserly initially refused to sign the consent form. On meeting with the shift commander she reconsidered, signed the form, and consented to the search. As a result, Deserly was accompanied by two female corrections officers to the women's restroom where Deserly removed her clothing. Each article of clothing was examined for contraband. Neither officer made physical contact with Deserly or conducted any body cavity search. The officers found that Deserly was wearing an underwire bra and that she was not concealing any contraband. Therefore, Deserly was allowed to make her visit wearing the bra.

¶8.On or about August 30, 1995, Deserly again visited the prison. She wore an underwire bra and, once more, she could not pass the metal detector. Deserly was advised, as she was previously, as to the necessity for a strip search and of the consequences of refusing. After initially declining to consent to a strip search, she offered to remove her bra and then go through the detector. Deserly was advised that removing her bra would be a partial strip search and that her consent would be required. Accordingly, Deserly signed the consent form and, in the presence of two female corrections officers in the restroom, removed her bra. Deserly was then taken back to the metal detector. After successfully passing through, she was allowed to return to the women's restroom, put on her bra, and then visit her husband.

¶9.Finally, the record reveals that Deserly was, for two and one-half years, a jailer for the Minnehaha County Jail in Sioux Falls, South Dakota. As a result of her training, she knew

what a strip search entailed and how to conduct one. Furthermore, Deserly read and was aware of the MSP Inmate Visiting Policy which, among other things, states that "Where a reasonable suspicion exists that the visitor may be carrying contraband, the officers may perform a strip search with the <u>written</u> authorization of the lieutenant or higher authority. The visitor will also sign a consent form prior to the search being conducted."

¶10.On these facts, the issue, then, is whether the District Court erred, as a matter of law, in granting summary judgement to DOC and in denying summary judgment to Deserly.

## Discussion

### I.

¶11.As already noted, the parties agree that there are no material facts in dispute and that this matter should be decided on the basis of cross-motions for summary judgment. Under these circumstances our standard of review is the same as that articulated in *Ross v. City of Great Falls*, 1998 MT 276, 291 Mont. 377, 967 P.2d 1103:

"Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Ash Grove Cement Co. v. Jefferson County* (1997), 283 Mont. 486, 491, 943 P.2d 85, 88; Rule 56(c), M.R.Civ.P. We review a district court's grant of summary judgment *de novo*, applying the same Rule 56(c), M.R.Civ.P., criteria as the district court. *Ash Grove Cement Co*., 283 Mont. at 491, 943 P.2d at 88 (citation omitted).

In the usual summary judgment case, we first determine whether "the moving party met its burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law." *Ash Grove Cement Co*., 283 Mont. at 491, 943 P.2d at 88 (citation omitted). In the present case, however, the parties agree on the material facts. As a result, the question before us is whether the District Court correctly concluded that the [movant] was entitled to judgment as a matter of law. We review a district court's conclusions of law to determine whether the interpretation of the law is correct. *Ash Grove Cement Co*., 283 Mont. at 491-92, 943 P.2d at 89 (citation omitted).

*Ross, ¶¶ 9-10.*

### II.

¶12.Deserly concedes that, because the State has an interest in the security of its penal institutions, searches of inmate visitors are justifiable only on satisfying a reasonable suspicion standard. She maintains, however, that the District Court erred in concluding that, without the use of a strip search, correctional officers would not have been able to determine whether it was indeed Deserly's underwire bra, and not contraband, which caused the metal detector to sound. Deserly contends that DOC failed to demonstrate and the court failed to consider that DOC's concededly legitimate penalogical need to conduct the search could not have been satisfied by more narrow means. Specifically, Deserly argues that, as they did in August 1995, the corrections officers could have and should have ordered Deserly to remove her underwire bra in the women's restroom without a strip search and then allow her to attempt to pass through the metal detector.

¶13.DOC responds that its officers had a reasonable suspicion to request Deserly to submit to a strip search. DOC points out that Deserly failed four times to successfully pass through the detector and that one of these attempts was specifically aimed at defeating the detector. While acknowledging her right of privacy, DOC argues that Deserly's expectation of her ability to preserve that right inside the MSP was unreasonable given the overriding interest of the MSP prison officials to protect the safety and security of the institution and the employees, inmates, and visitors within its confines as well as preventing the introduction of contraband into the institution by visitors.

¶14.Finally, DOC argues that Deserly voluntarily and knowingly waived her right of privacy when she signed the consent to search form. Since this last argument was not the basis for the trial court's decision, however, we decline to address it further. We decide, rather, whether the District Court correctly determined the MSP officers had a "reasonable suspicion" to request Deserly to participate in the strip search and whether the search, as conducted, was reasonable under the circumstances.

III.

¶15.This Court has not previously had occasion to consider a case involving the reasonableness of a personal search of an inmate visitor--specifically a strip search[1]-- within the confines of a correctional facility. We have in numerous cases, however, stated that Montanans enjoy a heightened right of privacy given this State's textual inclusion of that right in its Constitution, Article II, Section 10, and that when a right of privacy is specially implicated as part of a traditional search and seizure analysis, we must address the issue pursuant to both Sections 10 and 11 of Article II, of Montana's Constitution. *See*

*State v. Sheetz* (1997), 286 Mont. 41, 45- 47, 950 P.2d 722, 724-25 (citations omitted). Article II, Section 10, specifically protects the right of individual privacy and Article II, Section 11, provides protection against unreasonable searches and seizures of persons, papers, homes, and effects.

¶16.Moreover, we have held that to determine the threshold question of whether there has been an unlawful governmental intrusion into one's privacy in search and seizure situations, we will look to the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion. *State v. Bassett*, 1999 MT 109, ¶ 24, 294 Mont. 327, ¶ 24, 982 P.2d 410, ¶ 24 (citations omitted).

¶17.Finally, we have recognized a common law cause of action for invasion of privacy where the plaintiff is able to demonstrate a ". . . wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *See Sistok v. Northwestern Tel. Sys. Inc.,* (1980), 189 Mont. 82, 92, 615 P.2d 176, 182; *Rucinsky v. Hentchel* (1994), 266 Mont. 502, 505, 881 P.2d 616, 618.

IV.

¶18.We will return to these principles of Montana law. First, however, in the absence of Montana case law specifically dealing with the inmate visitor searches, we will briefly review the law pertaining to these types of searches as articulated by the federal courts-- keeping in mind our long-standing rule not to "march lock-step" with these courts where the broader protections of the Montana Constitution may be implicated. *See State v. Johnson* (1986), 221 Mont. 503, 512, 719 P.2d 1248, 1254; *Sheetz*, 286 Mont. at 47, 950 P.2d at 725.

¶19.We start by acknowledging that "[o]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes." *Hayes v. Marriott* (10th Cir. 1995), 70 F.3d 1144, 1146 (quoting *Canedy v. Boardman* (7th Cir. 1994), 16 F.3d 183, 185). Moreover, "the strip search of an individual by government officials, 'regardless how professionally and courteously conducted, is an embarrassing and humiliating experience.'" *Romo v. Champion* (10th Cir. 1995), 46 F.3d 1013, 1019, *cert. denied*, (1995), 516 U.S. 947, 116 S. Ct. 387, 133 L.Ed.2d 309, quoting *Boren v. Deland* (10th Cir. 1992), 958 F.2d 987, 988 n.1; *Hunter v. Auger* (8th Cir. 1982), 672 F.2d 668, 674. Finally, prison visitors retain a

Fourth Amendment right to be free from unreasonable searches and seizures. *Cochrane v. Quattrocchi* (1st Cir. 1991), 949 F.2d 11, 12-13 (citations omitted).

¶20. On the other hand, we also recognize that a prisoner does not have a due process right to unfettered visitation. *Kentucky Dep't of Corrections v. Thompson* (1989), 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506. Likewise, a citizen does not have a right to unfettered visitation of a prisoner that rises to a constitutional dimension. *See Spear v. Sowders* (6th Cir. 1995), 71 F.3d 626, 630. Moreover, "[i]n seeking entry into such a controlled environment, the visitor simultaneously acknowledges a lesser expectation of privacy," because of his insistence on access. *Spear*, 71 F.3d at 632 (citing *Blackburn*, 771 F.2d at 565).

¶21. Indeed, reasonable inmate visitor searches are a necessary and legitimate component of protecting employees, visitors, and inmates who, respectively, work in, visit from time to time, and reside in correctional facilities. As courts in numerous cases have observed, the purpose of a prison visitor search is to further prison security interests by preventing contraband from entering the prison. *Romo*, 46 F.3d at 1015-16; *Hunter,* 672 F.2d at 674; *Newman v. Alabama* (5th Cir. 1977), 559 F.2d 283, 291. *See also Bell v. Wolfish* (1979), 441 U.S. 520, 545-48, 99 S.Ct. 1861, 1877-79, 60 L.Ed.2d 447; *Pell v. Procunier* (1974), 417 U.S. 817, 823, 94 S.Ct. 2800, 2804-05, 41 L.Ed.2d 495 ("[c]entral to all other corrections goals is the institutional consideration of internal security").

¶22. Thus, because prisons are dangerous places for employees, visitors, and inmates, the basic constitutional issue becomes one of balancing the legitimate governmental interest in and need for searching inmate and prison visitors against the intrusions into personal rights and residual privacy interests that such searches entail. *Spear,* 71 F.3d at 630; *Hunter,* 672 F.2d at 673-74; *See also Delaware v. Prouse* (1979), 440 U.S. 648, 654, 99 S. Ct. 1391, 1396, 59 L.Ed.2d 660; *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884; *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889. The U.S. Supreme Court, at least, has consistently struck this balance in favor of institutional security. *See, e.g., Hudson v. Palmer* (1984), 468 U.S. 517, 527, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393; *Bell*, 441 U.S. at 548, 99 S.Ct. at 1879, *accord*.

¶23. While prison visitors can be subjected to some searches, such as pat-downs or metal detector sweeps, merely as a condition of visitation, absent any suspicion, more intrusive searches, such as strip searches, require more. *Spear*, 71 F.3d at 630. The federal courts have uniformly held that a warrantless strip search of a prison visitor is constitutionally

permissible as an exception to the warrant requirement of the Fourth Amendment only if the search is supported by "reasonable suspicion." *See Romo,* 46 F.3d at 1020; *Boren*, 958 F.2d at 988; *Varrone v. Bilotti* (2d Cir. 1997), 123 F.3d 75, 79; *Wood v. Clemons* (1st Cir. 1996), 89 F.3d 922, 929; *Daugherty v. Campbell* (6th Cir. 1991), 935 F.2d 780, 784, *cert. denied*, (1992) 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110; *Spear,* 71 F.3d at 632; *Thorne v. Jones* (5th Cir. 1985), 765 F.2d 1270, 1276-77, *cert. denied,* (1986), 475 U.S. 1016, 106 S.Ct. 1198-99, 89 L.Ed.2d 313; *Hunter*, 672 F.2d at 674-75.

¶24.Reasonable suspicion requires prison authorities to point to specific, objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. Moreover, their suspicions must be individualized, i.e., specifically directed to the person who is targeted for the strip search. *Boren*, 958 F.2d at 988; *Hunter,* 672 F.2d at 674-75. A reasonable suspicion of wrongdoing is something stronger than a mere hunch, but something weaker than probable cause. *Wood*, 89 F.3d at 929. In evaluating the totality of circumstances underlying the officer's determination of reasonable suspicion, the court should consider the quantity, or context, and quality, or degree, of reliability of the information available to the officer. *Alabama v. White* (1990), 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301.

V.

¶25.We now consider these principles within the context of Montana law and the facts of this case. First, does a prison inmate visitor have an actual expectation of personal privacy that society is willing to recognize as being objectively reasonable, i.e., the first and second prongs of the *Bassett* test? *Bassett, ¶ 24.*

¶26.We recognized in *Sheetz,* that:

[E]ven in Montana, when a person leaves the privacy of his home and exposes himself and his effects to the public and its independent powers of perception, it is clear that he cannot expect to preserve the same degree of privacy for himself or his affairs as he could expect at home.

*Sheetz, 286 Mont. at 49, 950 P.2d at 726. This truism is all the more germane to the situation where a person seeks to enter the dangerous and controlled environment of a correctional facility--a place where the government has a necessary and legitimate need to protect the security of those working, visiting, and residing in the institution from the introduction of contraband. We agree with the federal authorities cited above that a visitor demanding access to correctional facility "simultaneously acknowledges a*

*lesser expectation of privacy." Spear, 71 F.3d at 632; Blackburn, 771 F.2d at 565. Moreover, we agree that such persons can be subjected to pat-downs or metal detector sweeps merely as a condition of visitation and absent any suspicion of criminal activity. Spear, 71 F.3d at 630. In the context under consideration here, these sorts of searches are not sufficiently intrusive or personally invasive as to require further justification. See Sheetz, 286 Mont. at 50, 950 P.2d at 728.*

¶27.That, however, is not the case where a strip search is demanded. And, that requires that we look to the third prong of the *Bassett* test--the nature of the State's intrusion into the prison visitor's actual and objectively reasonable expectation of residual personal privacy. *Bassett,* ¶ 24. As we stated in *Sheetz,* we must consider "whether the State's method of investigation is so personally invasive that we recognize the intrusion as a search that requires further justification, such as a warrant or other special circumstances." *Sheetz,* 266 Mont. at 50, 950 P.2d at 728 (citing *State v. Stubbs* (1995), 270 Mont. 364, 892 P.2d 547; *State v. Ulrich* (1980), 187 Mont. 347, 609 P.2d 1218).

¶28.As we have already noted, requiring a person to take off his or her clothing in front of another person or persons, no matter how professionally and courteously conducted, is a degrading, embarrassing, and humiliating experience, and an invasion of personal privacy. *Hayes,* 70 F.3d at 1146; *Romo* 46 F.3d at 1019; *Hunter,* 672 F.2d at 674. Where a prison inmate visitor is requested to consent to a strip search as a condition of admittance to the facility, the visitor retains an actual expectation of personal privacy that society is willing to recognize as being objectively reasonable even under the federal constitution. *Spear,* 71 F.3d at 630. Clearly, Article II, Sections 10 and 11 of Montana's Constitution, which recognize even broader rights of individual privacy, support that same conclusion as well.

¶29.Accordingly, like the federal courts cited above, we determine that a warrantless strip search of a prison visitor is constitutionally permissible as an exception to the warrant requirement of Article II, Section 11, and is a permissible intrusion into the visitor's residual right of individual privacy under Article II, Section 10, only if the search is supported by "reasonable suspicion."

¶30.The definition of reasonable suspicion utilized by the federal courts is consistent with Montana law. Most often referred to in this State as "particularized suspicion" and sometimes as "reasonable grounds," both the legislature and this Court have adopted a test nearly identical to the federal reasonable suspicion standard in cases involving investigatory stops and *Terry*-type warrantless searches. *See, e.g., Hulse v. State,* 1998 MT 108, ¶ 12, 289 Mont. 1, ¶ 12, 961 P.2d 75, ¶ 12 (particularized suspicion is a question of fact dependent on the totality of circumstances and requires, first, that the State establish

objective data from which an experienced officer can make certain inferences; and, second, a resulting suspicion that an individual is or has been engaged in wrongdoing or was a witness to criminal activity) (citations omitted); *See also State v. Gopher* (1981), 193 Mont. 189, 194, 631 P.2d 293, 296 (adopting this two-part test from *United States v. Cortez* (1981), 449 U.S. 441, 101 S.Ct. 690, 66 L.Ed.2d 621); S*tate v. Sharp* (1985), 217 Mont. 40, 45, 702 P.2d 959, 962; *State v. Anderson* (1993), 258 Mont. 510, 514, 853 P.2d 1245, 1248; *State v. Reynolds* (1995), 272 Mont. 46, 49-50, 899 P.2d 540, 542; *State v. Lafferty*, 1998 MT 247, ¶¶ 9-10, 291 Mont. 157, ¶¶ 9-10, 967 P.2d 363, ¶¶ 9- 10, *accord*; and §§ 46-5-401, MCA, and 61-8-403(4)(a)(i). MCA.

¶31.Moreover, in judging the trial court's evaluation of the totality of circumstances, we assess the quantity and quality of the information known to the officer to determine the sufficiency of the objective data and the reasonableness of the officer's suspicion of criminal activity. *See, e.g., State v. Pratt* (1997), 286 Mont. 156, 161-62, 951 P.2d 37, 40-41 (stating that the parties appropriately focus their arguments on the nature of the information provided by the citizen informant and the role it played in the officer's determination of particularized suspicion); *State v. Collard* (1997), 286 Mont. 185, 192-93, 951 P.2d 56, 61 (discussing the quantity and quality of information available to the officer).

¶32.Accordingly, we conclude that a prison visitor can be requested to participate in a strip search where the prison authorities have specific, objective facts and rational inferences that they are entitled to draw from those facts in light of their experience that the person targeted for the strip search is engaged in wrongdoing.

¶33.Moreover, in judging the trial court's evaluation of the totality of circumstances surrounding the prison authorities' determination of "reasonable suspicion" and the underlying sufficiency of their objective data and the reasonableness of their suspicion of criminal activity, we will assess the quantity and quality of the information known to the officers.

## VI.

¶34.In the case at bar, the trial court ruled that the State had demonstrated that the prison authorities had a legitimate reasonable suspicion that Deserly might be engaged in wrongdoing when she failed to successfully pass through the metal detector during her January 1994 visit to the MSP. We agree.

¶35.On the day of her visit, Deserly attempted, unsuccessfully, to pass through the metal detector--four times, in fact. On one of these she tried to pass through sideways in an attempt to defeat the detector. Each time (with the apparent exception of the sideways attempt) Deserly set off the alarm, indicating the presence of metal on her person. While, as she points out, Deserly informed the MSP officer operating the metal detector that her underwire bra triggered the alarm, it can hardly be argued that the officer was required to simply accept as true this explanation at face value. In the first place, from the officer's perspective, it was just as likely that Deserly's explanation was not true and that she was concealing metal contraband on her person. In the second place, even if the officer were to assume that Deserly's underwire bra did activate the metal detector, that fact, as the trial court found, did not obviate the possibility that the bra was the only source of metal on Deserly's person. Finally, even though Deserly testified that on some prior occasions her bra triggered the metal detector while on other occasions it did not, that was no guarantee that the next time she visited the prison she could not be concealing contraband instead of, or in addition to, wearing the bra.

¶36.Deserly's argument that the bra itself was not contraband merely belies the fact that, absent her explanation--which the metal detector operator was not required to accept in any event--the MSP officer did not know what metal object was triggering the metal detector.

¶37.We agree with the trial court that, based upon the MSP officer's training and experience and the specific, objective facts described above, the officer was entitled to a rational inference that Deserly was concealing contraband on her person and was, therefore, engaged in wrongdoing. In short, we conclude that the District Court correctly determined that the totality of circumstances created a "reasonable suspicion" justifying the officer's demand that Deserly participate in a more invasive search of her person.

## VII.

¶38.Nonetheless, Deserly argues that, even though the MSP officers may have had a legitimate penalogical need to conduct the search in January 1994, she should not have been subjected to a strip search because there was a much narrower or less intrusive means available to the prison authorities to determine whether her failure to successfully negotiate the metal detector resulted from concealment of contraband. Deserly states that a narrower means requirement would have allowed her to remove her underwire bra in the women's restroom and then to see if she could pass through the metal detector, as occurred

during the August 1995 visit. She argues that the District Court failed to consider this argument and that, as a result, the court should be reversed and summary judgment should be entered in her favor. We disagree.

¶39.Primarily, Deserly relies on *Thorne* and *Hunter* for her "narrowest means" argument. Both of these cases involved strip searches of prison inmate visitors. *Thorne*, 765 F.2d at 1271; *Hunter*, 672 F.2d at 670. In *Thorne*, the court cited to its decision in *United States v. Lilly* (5th Cir. 1978), 576 F.2d 1240, a case dealing with a body cavity search of a prison inmate, and quoted from *Lilly* its statement that:

In the prison context, however, the government always must show that a legitimate penalogical need necessitated the search, that the need could not have been satisfied by a more narrow means, and that the search and any consequent seizure were conducted in a reasonable manner.

*Thorne, 765 F.2d at 1276 (quoting Lilly, 576 F.2d at 1246). The court then went on to state that it would be anomalous to accord inmates greater protection from unreasonable searches than inmate visitors and that "[u]nder Lilly, inquiry must be made into the reasonableness of a particular inmate search; the reasonableness of a particular visitor search must be determined in the same manner." Thorne, 765 F.2d at 1276 (emphases added) ( citations omitted).*

¶40.*Thorne* also cited to *Hunter* for the rule that "[t]o justify the strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts." *Thorne*, 765 F.2d at 1276 (citing *Hunter*, 672 F.2d at 674). *Hunter* did not refer to a more narrow means requirement.

¶41.*Thorne* is not directly on point, however. In *Thorne* the issue was not whether a strip search, justified by reasonable suspicion at the outset, was then conducted in such a fashion that the visitor was required to remove all his clothing as opposed to only those items most likely to conceal contraband. Rather, in *Thorne* there was no objective data to support a reasonable suspicion that Thorne was smuggling contraband. In other words, the question was not *how* the strip search was conducted but, rather, whether the search should have been conducted at all. *Thorne,* 765 F.2d at 1277.

¶42.In *Thorne* and *Hunter* the test relied on by both courts was whether, taking into consideration the quantity and quality of the information available and the totality of circumstances, the prison authorities had specific, objective facts and rational inferences

that they were entitled to draw from those facts in light of their experience that the person targeted for the strip search was engaged in wrongdoing.

¶43. *Lilly*, cited in *Thorne,* did allude to the necessity for reasonableness in "the means for conducting [body cavity searches of inmates]," *Lilly*, 576 F.2d at 1246. However, the court did not find the "means" utilized in that case violative of the Fourth Amendment, but, rather, that one defendant, Gallegos, did not have notice that she would be subject to such a search on returning from an out-of-facility, unsupervised educational program. *Lilly*, 576 F.2d at 1246. Accordingly, the cases Deserly cites for her narrowest means argument are not directly on point.

¶44. Nevertheless, we agree with Deserly that, once a strip search of a prison visitor is justified by reasonable suspicion, a reviewing court may still conduct a legitimate further inquiry into how the search was actually performed. In fact, while not cited by either Deserly or the State, we have adopted a "less intrusive means rule" in the context of inventory search cases. *See State v. Sawyer* (1977), 174 Mont. 512, 571 P.2d 1131; *State v. Sierra* (1985), 214 Mont. 472, 692 P.2d 1273, (*overruled on other ground by State v. Pastos* (1994), 269 Mont. 43, 57, 887 P.2d 199, 208); *City of Helena v. Lamping* (1986), 221 Mont. 370, 373, 719 P.2d 1245, 1248.

¶45. Notwithstanding, we conclude, that on the facts of the case at bar and applying the test for inmate visitor searches that we have articulated above, the strip search of Deserly by the MSP officers on January 19, 1994, was supported by reasonable suspicion and was conducted in a manner that both took into account Deserly's residual privacy interest and, yet, fulfilled DOC's legitimate penalogical need to insure that she was not carrying metal contraband in some article of her clothing.

¶46. The fact that the August 1995 search was conducted in a more narrow manner than was the January 1994 search does not, without more, support a conclusion that the 1994 search was, therefore, unreasonable. Each search must, necessarily, stand or fail on its own merits. The ultimate question is not simply whether, based on a post-hoc evaluation, there was some alternative means of conducting the search, but whether the prison authorities acted reasonably and used the least intrusive means under the circumstances presented by the search at issue. Even though the January 1994 search could have been conducted in the same manner as was the August 1995 search, we are not persuaded that the January 1994 search was unreasonable for that reason alone.

¶47.To the contrary, taking into consideration the quantity and quality of the information available to the MSP officers and the totality of circumstances presented during Deserly's four unsuccessful attempts to pass through the metal detector, we conclude that the search was reasonable. The prison authorities had specific, objective facts and rational inferences that they were entitled to draw from those facts in light of their experience that Deserly was engaged in concealing metal contraband on her person. The January 19, 1994 strip search performed on the basis of those facts and inferences was not unreasonable even though the search conducted some eight months later was performed with less invasion of Deserly's privacy.

¶48.We hold that the District Court did not err in granting summary judgment to DOC and in denying summary judgment to Deserly.

¶49.Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

1. The First Circuit has described the various levels of nude searches of the person:

A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Blackburn v. Snow (1st Cir. 1985), 771 F.2d 556, 561 n.3 (citation omitted). We adopt these definitional parameters to conclude that, here, Deserly was subject to the first level of nude search, i.e., a "strip search." Since this case involves only this type of search, we specifically do not address the legal standards which might justify performing either of the remaining levels of nude searches.*