No. 00-175

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 316

302 Mont. 483

15 P.3d 872

NORMA J. STEINBACK, Personal Representative

of the Estate of Jack Steinback, Deceased,

Plaintiff and Appellant,

v.

BANKERS LIFE AND CASUALTY COMPANY,

Defendant and Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

Honorable Susan P. Watters, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

L. Randall Bishop, Jarussi and Bishop, Billings, Montana

For Respondent:

Dan L. Spoon and Robert T. Bell, Reep, Spoon and Gordon,

Missoula, Montana

Submitted on Briefs: September 7, 2000
Decided: December 12, 2000

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1 This case involves a dispute over benefits in a nursing home insurance policy. The Thirteenth Judicial District Court, Yellowstone County, granted summary judgment to Bankers Life and Casualty Company and later dismissed the action. Norma J. Steinback appeals. We affirm.

¶2 The issue is whether the District Court erred in granting Bankers Life's motion for summary judgment on the contract claim.

¶3 On May 11, 1995, Bankers Life agent James Van Noten visited the home of Jack and Norma J. Steinback to sell them nursing home insurance. Mr. Van Noten's visit was prompted by the Steinbacks' return of a postcard to Bankers Life indicating interest in such insurance.

¶4 Mrs. Steinback took the lead in the couple's discussion with Mr. Van Noten. She told Mr. Van Noten that Mr. Steinback had a heart condition, diabetes, and vision problems associated with the diabetes. She also told Mr. Van Noten that Mr. Steinback, who was seventy-five years old, suffered from "a hardening of the arteries." Based on these disclosed medical conditions, Mr. Van Noten decided that Mr. Steinback would only be eligible for a higher risk policy. He proceeded to interview the Steinbacks in order to fill out the application for the insurance policy.

¶5 Mr. Van Noten specifically asked the Steinbacks seven qualifying questions, including whether Mr. Steinback had "[s]een a doctor professionally or had medical treatment or advice for Parkinson's Disease, memory loss, Alzheimer's Disease, or any other organic brain disorder" within the year preceding the application. The Steinbacks answered "no" to that question and Mr. Van Noten marked their answer on the application.

¶6 After the interview was completed and the application was submitted, an insurance policy was issued for Mr. Steinback. Mr. Van Noten gave the Steinbacks a copy of the application along with the policy, which contained a notice advising them to notify Bankers Life of any erroneous information found in the application.

¶7 In November 1996, Mr. Steinback was placed in a nursing home in Billings, Montana, and submitted a claim for benefits to Bankers Life. During investigation of the claim, Bankers Life discovered that in February and March of 1995, Dr. Ruben of the Billings Clinic had treated Mr. Steinback for "[m]oderate to severe organic brain deficit" and what Dr. Ruben believed may be Alzheimer's Disease. Dr. Ruben stated that Mrs. Steinback had brought Mr. Steinback to his office because of his memory loss and progressive confusion. According to Bankers Life, no insurance policy would have been issued had this information been disclosed during the application process.

¶8 On April 3, 1997, Mr. Steinback died. One month later, based upon its investigation, Bankers Life denied the claim for Mr. Steinback's nursing home care, rescinded the policy, and refunded the premiums to Mrs. Steinback. Mrs. Steinback then filed this action alleging breach of contract and violation of the Unfair Claims Settlement Practices Act and requesting punitive damages.

¶9 Both parties moved for summary judgment on the breach of contract claim. Bankers Life submitted the deposition of Mr. Van Noten in support of its motion. Mrs. Steinback did not submit any depositions or affidavits of her own, but instead also relied on the Van Noten deposition. After receiving briefing and oral argument, the court granted Bankers Life's motion for summary judgment on the contract claim. The court later granted summary judgment to Bankers Life on the remaining claims and dismissed Mrs. Steinback's complaint.

## Discussion

¶10 Did the District Court err in granting Bankers Life's motion for summary judgment on the contract claim?

¶11 Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. If the moving party has demonstrated that no genuine issues of material fact exist, then the party opposing the motion must come forward with substantial evidence raising a genuine issue. *Downs v. Smyk* (1979), 185 Mont. 16, 20, 604 P.2d 307, 310. On appeal from a summary judgment, this Court reviews the case *de novo*. *Thomas v. Northwestern Nat. Ins. Co.*, 1998 MT 343, ¶ 14, 292 Mont. 357, ¶ 14, 973 P.2d 804, ¶ 14. Our standard of review is to determine whether the district court's interpretation of the law was correct. *Ash Grove Cement Co. v. Jefferson County* (1997), 283 Mont. 486, 491, 943 P.2d 85, 89.

¶12 Here, the District Court agreed with Bankers Life that the record establishes that the Steinbacks provided false information on their application by not disclosing Dr. Ruben's treatment. The court ruled that Bankers Life was therefore entitled to rescind the nursing home policy under § 33-15-403, MCA, "Representations in applications-recovery precluded if fraudulent or material," and that no breach of contract claim could be maintained.

¶13 Mrs. Steinback argues on appeal that the record establishes that Bankers Life was placed on notice of Mr. Steinback's memory problems by (1) her statement to Mr. Van Noten that Mr. Steinback suffered

from "a hardening of the arteries," and (2) Mr. Steinback's behavior during the application interview. Under this "inquiry notice" argument, an insurance policy is not avoided if the insurer knows the facts or the falsity of the statements or has sufficient indications that would put a prudent person on notice so as to induce inquiry which, if done with reasonable thoroughness, would reveal the truth. *See American States Ins. Co. v. C.F. Halsted* (Ala. 1991), 588 So.2d 870, 873.

¶14 In her brief, Mrs. Steinback characterizes Mr. Steinback's behavior at the application interview as "so visibly confused that he didn't even understand what was going on, or why." The record, which for purposes of this point consists of Mr. Van Noten's deposition, does not support that statement. Mr. Van Noten's deposition instead establishes his opinion that Mr. Steinback was opposed to Mrs. Steinback's plan to purchase nursing home protection. When viewed in context, as opposed to the out-of-context quotes provided by Mrs. Steinback's counsel, the Van Noten deposition illustrates that Mr. Steinback appeared to understand quite clearly the nature of the insurance that was being obtained.

Q. Um-hmm. How did Jack seem?

A. Quiet.

Q. Quiet?

A. Yeah. He was not very happy.

Q. Why?

A. Because Norma wanted to buy a policy for him. He was not very happy. Most men aren't. Most men are not very happy when it comes to the nursing home protection. More the wives, I think, are better, better when it comes to making a decision.

Q. Is that what happened here?

A. Yeah.

Q. That Jack was quiet and Norma made the decisions?

A. He was upset, yeah.

Q. Did he seem--

A. She had, she had to convince him that it was in his best interests to apply.

Q. Do you remember Jack saying something to Norma like, "Why are you doing this to me?"

A. Yes. Yeah.

Q. Did he seem confused about what was going on?

A. No, no. He was mad.

Q. Angry?

A. Yeah, about her wanting to buy him a nursing home policy. He seemed very normal to me with the, with the, with the amount of time I spent with them.

Q. Do you remember Norma telling you that Jack gets confused?

A. No. No.

Q. That he had some memory loss?

A. No. She never told me that.

. . .

Q. Do you remember Jack indicating that he was angry because he thought that Norma was signing papers to put him in a nursing home?

A. No, no. To buy, spend the money for a nursing home-to spend the money for the policy.

Q. He didn't want to spend the money?

A. Yeah. Right, yeah.

The testimony to which Mrs. Steinback cites merely elaborates on this same issue. Mr. Van Noten clearly did not testify that Mr. Steinback was visibly confused and did not understand what was going on or why:

Q. Did he say, "I don't understand why you're doing this?"

A. No-yeah, yeah, he did.

Q. He did?

A. Yeah, yeah, um-hmm. He was, he was opposed to nursing home protection. She had to

convince him.

¶15 We next address Mrs. Steinback's other argument, that her disclosure that her husband suffered from "a hardening of the arteries" should have signaled his mental condition to Bankers Life, or at least was ambiguous and as such must be interpreted against the insurer. Mrs. Steinback asserts, with citations to case law, that for a person of her generation, the phrase "a hardening of the arteries" may be understood to mean that he suffered from memory problems.

¶16 Mr. Van Noten testified that he interpreted the "hardening of the arteries" comment as relating to Mr. Steinback's heart problems. But more importantly, Mr. Van Noten's deposition establishes that he specifically asked the Steinbacks if Mr. Steinback had "[s]een a doctor professionally or had medical treatment or advice for Parkinson's Disease, memory loss, Alzheimer's Disease, or any other organic brain disorder" within the year preceding the application. We note that this question included the common term "memory loss," in addition to the more technical medical terms which Mrs. Steinback arguably may not have understood. The Steinbacks answered the question "no."

¶17 The District Court said,

> The Steinbacks were asked a clear and unambiguous question about Mr. Steinback's history of organic brain disorders, including Alzheimer's Disease, and the Steinbacks stated that Mr. Steinback did not have a history of such conditions even though Dr. Ruben had diagnosed the organic brain deficit months earlier.

Notwithstanding Mrs. Steinback's arguments on the proper interpretation of her disclosure that her husband suffered from "a hardening of the arteries," the "no" answer to the question of whether Mr. Steinback had been treated for Parkinson's Disease, memory loss, Alzheimer's Disease, or any other organic brain disorder within the past year could hardly have been more clear.

¶18 Not only did the insurance policy application include the above question to which a false answer was given, but a copy of the insurance application was later returned to the Steinbacks with the highlighted provision that any errors in the application should be brought to Bankers Life's attention. The "memory loss" question was not buried in the policy, but was one of only seven "qualifying" questions on the front sheet of the application form. No errors were brought to Bankers Life's attention.

¶19 On this record, we conclude that the District Court was correct in granting summary judgment for Bankers Life that rescission of the insurance contract after Bankers Life discovered the false answer did not constitute breach of contract. We affirm the decision of the District Court.

/S/ J. A. TURNAGE

We concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

Justice Jim Regnier dissenting.

¶20 I believe this is a troubling case and should be submitted for jury determination rather than disposed of through a summary judgment proceeding.

¶21 Certainly both the District Court and this Court are limited by the status of the record developed during the litigation and presented on appeal. Here, the deposition of Mr. Van Noten provides the only insight into the critical interview that took place on May 11, 1995, when the Steinbacks applied for the nursing home insurance policy. Mr. Steinback is deceased and Mrs. Steinback did not testify by deposition nor was her affidavit presented in the summary judgment proceeding. Nonetheless, understanding the strict burden imposed on the moving party in a summary judgment proceeding, I believe there is a question of fact that could not be resolved by summary judgment, namely, whether the Bankers Life agent was sufficiently aware of Mr. Steinback's condition to put him and his company on inquiry notice that further investigation into Mr. Steinback's mental and physical status might be appropriate.

¶22 First, it is important to put this matter into context. The Steinbacks were solicited by Bankers Life to purchase nursing home insurance. They were elderly. Mr. Steinback was 75 years old and suffering from a myriad of medical conditions. Bankers Life was aware that he had heart disease, diabetes, "hardening of the arteries," and vision difficulties associated with his diabetes. In fact, Mr. Steinback was ineligible to receive the standard policy because of his medical and physical condition and was sold a high risk policy specifically because of his condition. This high risk policy had fewer questions regarding the applicant's health and when issued required higher premiums than the standard policy. Bankers Life, however, was more than happy to accept the Steinbacks' application for insurance benefits and insure Mr. Steinback under its high risk policy without making any further inquiry into his medical history.

¶23 Second, it is also important to note that an executed medical authorization form was included with Mr. Steinback's application. In other words, Mr. Steinback provided Bankers Life with full and unbridled authority to request any and all of his past medical records, submit them for scrutiny by its own underwriters and medical staff, and then make a fully informed judgment as to whether it wished to provide nursing home insurance to a 75-year-old man suffering from heart disease, diabetes, "hardening of the arteries," and vision problems. In fact, most consumers of disability insurance fully expect insurers to make such an investigation. That is the precise reason why insurers demand medical authorizations before issuing policies. Given the history of this case, however, it appears that the procedure followed by Bankers Life is to do a mass solicitation targeting the elderly, issue insurance policies without investigating medical histories, accept premiums, and ask questions later. It further

appears that Bankers Life is only concerned about a prospective applicant's medical status when a claim is filed. Then the investigation begins in an effort to deny the claim.

¶24 Mrs. Steinback, in my view, presented equivocal information to the agent regarding her husband's mental and medical status. As the majority noted, she was specifically asked if her husband suffered any type of memory problems in the past and, according to Mr. Van Noten, she answered in the negative. Yet, she volunteered medical information concerning her husband that would suggest to anyone, especially considering her husband's age, that he would be a high risk person to insure for nursing home insurance. Also, she volunteered that he suffered from "hardening of the arteries." Although Mr. Van Noten testified that he associated that condition with Mr. Steinback's heart condition, I would suggest that many individuals in Mr. and Mrs. Steinback's generation would also associate "hardening of the arteries" with memory loss and other types of mental dysfunctions. In her brief filed with this Court, she directs us to both medical texts and case law in support of the proposition that "hardening of the arteries" is a condition that is associated with mental dysfunction in the elderly. Based only on Mr. Van Noten's testimony, I believe he was confronted with ambiguous medical information from Mrs. Steinback regarding her husband. Mr. Van Noten and his company should have made further inquiry if they were concerned about Mr. Steinback's insurability. If we construe the facts in a light most favorable to the Steinbacks, as we must do under our rules governing summary judgment, I believe there is a question of fact that could only be resolved by a jury.

¶25 I am even more concerned when reading the deposition of Mr. Van Noten. Mr. Van Noten's standard procedure is to go through the application and ask the proposed insureds if they suffer any of the conditions described. If the proposed insured answers "no" or says nothing, then Mr. Van Noten marks "no" on the application. The proposed insured does not complete the application in his or her own handwriting, but Mr. Van Noten fills it out. When Mr. Van Noten was questioned in his deposition about the specific question concerning a history of medical treatment or advice for Parkinson's Disease, memory loss, Alzheimer's Disease or any other organic brain disorder, he testified that he couldn't remember whether the Steinbacks gave an actual response of "no" or whether they were simply silent. We don't know if Mrs. Steinback, an elderly person herself, even heard or understood Mr. Van Noten's question.

¶26 Considering the scenario that occurred in the instant case, I am not comfortable affirming the grant of summary judgment. I would reverse the judgment of the District Court and remand this matter for trial before a jury.

/S/ JIM REGNIER

Justices William E. Hunt, Sr. and Terry N. Trieweiler join in the foregoing dissent.

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER