FILED

09/15/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0734

DA 19-0734

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 230

WILLIAM SCOTT ROGERS, individually and on behalf
of all others similarly situated,

        Plaintiffs and Appellants,

    v.

LEWIS & CLARK COUNTY, LEWIS & CLARK COUNTY SHERIFF'S OFFICE,
LEO C. DUTTON, in his capacity as Lewis & Clark County Sheriff,
JASON GRIMMIS, in his capacity as Lewis & Clark County Undersheriff
and former Captain for the Lewis & Clark County Detention Center,
ALAN HUGHES, in his capacity as Captain for the Lewis & Clark Detention Center,
JOHN and JANE DOES 1 through 50, in their capacity as Employees of the Lewis &
Clark County Detention Center,

        Defendants and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV-2018-1332
Honorable Mike McMahon, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            John Doubek, Jonathan King, Keif Storrar, Doubek, Pyfer & Storrar, PLLP,
            Helena, Montana

        For Appellees:

            Mitchell A. Young, Maureen Lennon, MACo Defense Services, Helena,
            Montana

        For Amici:

            Marty Lambert, Gallatin County Attorney, Bozeman, Montana

Submitted on Briefs:  July 15, 2020

Decided:  September 15, 2020

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1      William Scott Rogers, leading a group of ninety-six named plaintiffs, filed suit against Lewis and Clark County, the Lewis and Clark County Sheriff's Office, and various officials from the sheriff's office in their official capacities (the "Defendants"), challenging the Lewis and Clark County Detention Center ("Detention Center") policy to conduct an unclothed visual body cavity search or "strip search"[1] of every detainee prior to placement in the general population of the facility, regardless whether reasonable suspicion existed that the individual was concealing a weapon or contraband, as a violation of their constitutional rights and § 46-5-105, MCA.  The plaintiffs sought certification as a class action.  On December 20, 2019, the First Judicial District Court, Lewis and Clark County, issued an order granting the Defendants summary judgment as to ninety-two of the named plaintiffs (the "Plaintiffs"), who were placed into the general population of the facility at

---

[1] The term "strip search" is an imprecise term.  *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 325, 132 S. Ct. 1510, 1515 (2012).  Previously, this Court adopted the definitional parameters that "[a] 'strip search,' though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities.  A 'visual body cavity search' extends to visual inspection of the anal and genital areas.  A 'manual body cavity search' includes some degree of touching or probing of body cavities." *Deserly v. Dep't of Corr.*, 2000 MT 42, ¶ 15 n.1, 298 Mont. 328, 995 P.2d 972 (quoting *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985)).  The United States Supreme Court in *Florence* adopted a broader definition, explaining that the term "strip search" could encompass what we defined in *Deserly* as a "visual body cavity search." *See Florence*, 566 U.S. at 325, 132 S. Ct. at 1515.  Neither party challenges that the visual body cavity search at issue in this appeal is encompassed within the term "strip search" as used in § 46-5-105, MCA.  Thus, we use the term "strip search" in this opinion to encompass a visual body cavity search.  This, however, does not change or expand our holding in *Deserly*, in which we dealt only with a visual inspection of a naked individual without scrutiny of the subject's body cavities and "specifically [did] not address the legal standards which might justify performing either of the remaining levels of nude searches." *Deserly*, ¶ 15 n.1.

some point after they were strip searched and denied the motion as to four plaintiffs who were never placed in the general population of the facility after they were strip searched. The District Court held that in regard to the ninety-two plaintiffs, the strip search policy does not violate Article II, Sections 10 and 11, of the Montana Constitution or § 46-5-105, MCA. The District Court certified the order as a final judgment under M. R. Civ. P. 54(b) and the Plaintiffs appeal.

¶2    Although we conclude the District Court's certification order is not in substantial compliance with the requirements of M. R. App. P 6(6) and our case law interpreting certification under M. R. Civ. P. 54(b), given the unique circumstances of this case, we assume supervisory control over this proceeding to address the following issues:

> *1. Whether the Detention Center's policy to strip search a detainee arrested for traffic or non-felony offenses prior to placement in the general population of the facility without a reasonable suspicion to believe that person is concealing a weapon, contraband, or evidence of the commission of a crime violates Article II, Sections 10 and 11, of the Montana Constitution;*
>
> *2. Whether the Detention Center's policy to strip search a detainee arrested for traffic or non-felony offenses prior to placement in the general population of the facility without reasonable suspicion to believe that person is concealing a weapon, contraband, or evidence of the commission of a crime violates § 46-5-105, MCA.*

¶3    We affirm the District Court in part and reverse in part and remand for further proceedings consistent with this Opinion.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4    The Lewis and Clark County Detention Center is the only detention facility in Lewis and Clark County. It houses pretrial detainees charged with both felonies and misdemeanors, individuals sentenced to jail terms, and individuals convicted of felonies

4

and sentenced to the Department of Corrections who have not been moved to a state facility. The Detention Center includes a booking area, holding cells, solitary cells, and a secure area, which includes a library and housing pods with multiple cells per pod. Inmates are frequently housed in areas not designed for long term occupancy, such as the library and holding cells, because the jail population exceeds the designed bed space.

¶5 Unwritten Detention Center policy requires a strip search of any person being placed into the general population of the facility to prevent arrestees from bringing weapons or contraband into the secure housing area of the facility and to identify any wounds, tattoos, or other visible artifacts which might affect individual safe placement. Under the policy, any placement in which two or more inmates have the opportunity for direct physical contact without direct supervision by a detention officer or law enforcement officer is considered a general population placement. Strip searches at the facility are conducted by an officer of the same sex as the inmate. Before conducting the strip search, the officer conducting the search removes his or her body camera and takes the detainee into a private room. The officer instructs the detainee to remove all of his or her clothing while the officer observes. The officer inspects the soles of the inmate's feet, the inmate's armpits, and inside the inmate's mouth. The officer then instructs the inmate to turn around and spread his or her buttocks while in a half prone position, cough while squatting, and, if male, turn and face the officer and lift his genitals, and, if female, to lift her breasts and remove any feminine hygiene products in use. The officer does not physically touch the inmate during the search.

5

¶6 The Plaintiffs allege they were each arrested for a traffic or non-felony criminal offense and subject to a strip search as part of the booking process at the Detention Center without reasonable suspicion to believe they were in possession of weapons or contraband. They allege the Detention Center's blanket policy to strip search anyone being booked into the general population of the facility violates their constitutional and statutory rights. The Plaintiffs brought seven claims against the Defendants in their amended complaint captioned "Constitutional Violations" (Count I), "Negligence" (Count II), "Negligence Per Se" (Count III), "Negligent Supervision" (Count IV), "Intentional Infliction of Emotional Distress" (Count V), "Negligent Infliction of Emotional Distress" (Count VI), and "Invasion of Privacy" (Count VII). Defendants did not concede the absence of reasonable suspicion to conduct strip searches of the individual Plaintiffs but conceded the Plaintiffs would have been strip searched whether or not reasonable suspicion existed.

¶7 The Plaintiffs filed a motion for partial summary judgment, a motion for class certification, and a class discovery motion. In response, the Defendants filed a motion to dismiss, which the District Court converted into a motion for summary judgment. After a hearing on the motions, the District Court denied Plaintiffs' motion for partial summary judgment, granted summary judgment to the Defendants in regard to the ninety-two Plaintiffs placed in general population, stayed the motions for class certification and class discovery, and certified the order as a final judgment under Mont. R. Civ. P. 54(b).

6

**STANDARD OF REVIEW**

¶8 We review de novo a district court's grant or denial of summary judgment, applying the criteria of M. R. Civ. P. 56(c). *Deserly v. Dep't of Corr.*, 2000 MT 42, ¶ 11, 298 Mont. 328, 995 P.2d 972. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admission on file, together with any affidavits, demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c).

**DISCUSSION**

¶9 Before we can reach and address the merits of the issues in this case, we must first address whether this Court has jurisdiction to consider this appeal. The District Court purported to certify this case under M. R. Civ. P. 54(b) as a final order. The Plaintiffs filed a notice of appeal with this Court acknowledging the appeal was certified under M. R. Civ. P. 54(b) in accordance with M. R. App. P. 4(4). Without waiting for this Court to issue an order allowing the appeal to continue under M. R. App. P. 4(4) and without noticing the Court of the pending issue, the parties proceeded to fully brief the case.

¶10 Parties cannot stipulate certification of an order under M. R. Civ. P. 54(b) was proper and this Court will dismiss cases, even fully briefed cases, improperly brought on appeal under M. R. Civ. P. 54(b). *See, e.g.*, *Satterlee v. Lumberman's Mut. Cas. Co.*, 2007 MT 325, ¶ 11, 340 Mont. 176, 178 P.3d 689; *In re Marriage of Armstrong*, 2003 MT 277, ¶ 6, 317 Mont. 503, 78 P.3d 1203. Whether the District Court properly certified an order as final under Rule 54(b) is a jurisdictional issue for this Court and cannot be waived.

7

*Kohler v. Croonenberghs*, 2003 MT 260, ¶¶ 8-9, 317 Mont. 413, 77 P.3d 531; *Weinstein v. Univ. of Mont.*, 271 Mont. 435, 443, 898 P.2d 101, 106 (1995). Thus, this Court must address the issue even when no party raises it. *See Satterlee*, ¶ 11; *In re Marriage of Armstrong*, ¶ 6; *Kohler*, ¶ 9; *Roy v. Neibauer*, 188 Mont. 81, 84, 610 P.2d 1185, 1187-88 (1980).

¶11 A district court may direct entry of final judgment under M. R. Civ. P. 54(b) "only upon an express determination that there is no just reason for delay" and,

> [i]n so doing, the district court must balance the competing factors present in the case to determine if it is in the interest of sound judicial administration and public policy to certify the judgment as final, and the court shall, in accordance with existing case law, articulate in its certification order the factors upon which it relied in granting certification.

M. R. App. P. 6(6). As set forth in *Roy*, 188 Mont. at 87, 610 P.2d at 1189, the factors this Court normally considers regarding a Rule 54(b) certification include: (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, triviality of competing claims, expense, and the like. In certifying an order under M. R. Civ. P. 54(b), a district court must follow three "guiding principles": (1) the burden is on the party seeking certification to convince the district court the case is the "infrequent harsh case" meriting

8

a favorable exercise of discretion; (2) the district court must balance the competing factors present in the case to determine if it is in the interest of sound judicial administration and public policy to certify the judgment as final; and (3) the district court must marshal and articulate the factors upon which it relied in granting certification so that prompt and effective review can be facilitated. *Kohler*, ¶ 16 (quoting *Roy*, 188 Mont. at 87, 610 P.2d at 1189). "[A] trial court must clearly articulate its reasoning behind any factors set forth, so this Court has some basis for distinguishing between well-grounded orders and 'mere boiler-plate approval unsupported by the facts or an analysis of the law.'" *In re Marriage of Armstrong*, ¶ 12 (quoting *Kohler*, ¶ 14).

¶12 The District Court certified the order as final because (1) the ninety-two plaintiffs whose claims were dismissed under the order may be realigned with the remaining plaintiffs should the Supreme Court reverse the order; (2) class certification may largely depend on whether those ninety-two plaintiffs are returned to the case; (3) the case could increase or decrease in complexity depending on the number of plaintiffs; (4) class discovery could be enlarged; and (5) the Supreme Court would not be required to determine the application of *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 132 S. Ct. 1510 (2012), to the plaintiff's constitutional and statutory based claims a second time.

¶13 Upon review of the District Court's order, we find it is deficient to support certification under M. R. Civ. P. 54(b). First, it does not "expressly determine[] that there is no just reason for delay" as required by M. R. Civ. P. 54(b) and M. R. App. P. 6(6).

9

"This omission alone would be sufficient to conclude that the certification order in this case does not vest jurisdiction in this Court to entertain the appeal." *In re Marriage of Armstrong*, ¶ 11. Second, although the District Court cited *Weinstein* and *Roy*, it failed to address the factors this Court laid out in those cases. The District Court's reasoning for granting certification focuses on economic concerns and simplifying the litigation going forward. But such reasoning is not sufficient to justify certification of an order as final under M. R. Civ. P. 54(b). In *In re Marriage of Armstrong*, this Court rejected as insufficient bases for certification the district court's findings "that the determination of this issue 'may' eliminate the need for a trial on property issues, saving resources for both the trial court and the litigants in this case" and the determination of the issue "'could' shorten the time of trial." *In re Marriage of Armstrong*, ¶ 13. Likewise, the District Court's reasoning here that the dismissed Plaintiffs may be realigned with the remaining plaintiffs and the complexity of the case could increase or decrease are not sufficient bases for certification under M. R. Civ. P. 54(b) without additional explanation of the *Roy* factors. The District Court's order in this case is deficient and this Court lacks jurisdiction over this appeal under M. R. Civ. P. 54(b).

¶14 District courts and litigants must be mindful of the requirements of certification under M. R. Civ. P. 54(b) and M. R. App. P. 4(4) and 6(6). *See Roy*, 188 Mont. at 84, 610 P.2d at 1187 ("Too often this Court is confronted with cases that are not ready for appellate review within the meaning of the rules, but where the opposing parties do not bring this crucial fact to our attention. We often do not discover this until we are deeply

into the process of review and indeed often in the opinion-writing stage. We cannot and will not tolerate this state of affairs." (internal quotation omitted)). When an order allowing for the appeal to proceed pursuant to M. R. App. P. 4(4) was not forthcoming from the Court, the litigants should have filed a notice of issue seeking such an order before proceeding with briefing. Litigants should be mindful of wasting the resources and time of this Court to consider appeals over which it lacks jurisdiction.

¶15 We, nonetheless, accept jurisdiction over this appeal under our constitutional power of supervisory control given the specific circumstances of this case. Article VII, Section 2(2), of the Montana Constitution grants this Court "general supervisory control over all other courts." "This extraordinary remedy can be invoked when the case involves purely legal questions and urgent or emergency factors make the normal appeal process inadequate." *State v. Spady*, 2015 MT 218, ¶ 11, 380 Mont. 179, 354 P.3d 590 (citing M. R. App. P. 14(3); *Redding v. McCarter*, 2012 MT 144, ¶ 17, 365 Mont. 316, 281 P.3d 189). In addition, the case must meet one of three criteria: (a) the other court is proceeding under a mistake of law and is causing a gross injustice; (b) constitutional issues of state-wide importance are involved; or (c) the other court has granted or denied a motion for substitution of a judge in a criminal case. M. R. App. P. 14(3)(a)-(c).

¶16 Supervisory control is an extraordinary remedy, reserved for extraordinary circumstances. *Stokes v. Mont. Thirteenth Judicial Dist. Court*, 2011 MT 182, ¶ 5, 361 Mont. 279, 259 P.3d 754. "We will assume supervisory control over a district court to direct the course of litigation if the court is proceeding based on a mistake of law, which

11

if uncorrected, would cause significant injustice for which appeal is an inadequate remedy." *Stokes*, ¶ 5. "Judicial economy and inevitable procedural entanglements [have been] cited as appropriate reasons for this Court to issue a writ of supervisory control." *Stokes*, ¶ 5 (quoting *Truman v. Mont. Eleventh Judicial Dist. Court*, 2003 MT 91, ¶ 15, 315 Mont. 165, 68 P.3d 654) (alterations in original).

¶17    Under the extraordinary circumstances of this case, we have decided to exercise our power of supervisory control. The questions presented to this Court are purely legal ones: whether Article II, Sections 10 and 11, of the Montana Constitution or § 46-5-105, MCA, prohibit the searches at issue here. The answer will govern who is included in the potential class action and how the litigation proceeds. The preparation and presentation of the case will be significantly affected by the answer to these two questions. "If incorrect, the [district] court's conclusions will impact all aspects of the proceeding from preparation for trial to settlement negotiations and the trial itself." *Stokes*, ¶ 8 (quoting *Truman*, ¶ 16). "Denial of a speedy remedy by supervisory control on the straightforward legal issue presented in the present case would amount to a substantial injustice." *Stokes*, ¶ 8. This is especially true in this case when the District Court's order has effectively ended the case before that court for ninety-two of the named plaintiffs and litigation for the remaining plaintiffs could drag on for years.

¶18    Further, it is clear constitutional questions of statewide importance are at issue in this case. The Defendants admitted they continue to engage in the challenged conduct, and they believe other detention facilities in the State have similar strip search policies. Failure

to review the District Court's order under supervisory control leaves these challenged policies in place. Should this Court ultimately reverse the District Court on either of the two issues presented on this appeal, failure to review the issue now could result in the rights of many additional Montanans being violated and the potential liability of the detention facilities conducting such searches continuing to grow. We therefore elect to exercise supervisory control over the two questions presented on appeal.

¶19 *1. Whether the Detention Center's policy to strip search a detainee arrested for traffic or non-felony offenses prior to placement in the general population of the facility without reasonable suspicion to believe that person is concealing a weapon, contraband, or evidence of the commission of a crime violates Article II, Sections 10 and 11, of the Montana Constitution.*

¶20 The District Court rejected the Plaintiffs' constitutional claims, concluding Plaintiffs had no actual expectation of privacy recognized as objectively reasonable by society and thus there was no search or seizure that implicated or violated the protections contemplated under Article II, Sections 10 and 11, of the Montana Constitution. The court explained:

> when weighed against the need to maintain institution security, safety, and health . . . society would always insist that an arrestee's Article II, section 10, privacy right must yield when they are placed in a jail, detention center, or prison's general custody or general population in order to prevent "any new inmate, either of his own will or as a result of coercion, from putting all who live and work at these institutions at even greater risk when [he/she] is admitted to [general custody] or general population."

(quoting *Florence*, 566 U.S. at 333-34, 132 S. Ct. at 1520) (alterations in original).

¶21 On appeal, the Plaintiffs maintain they had an actual expectation of privacy to not be strip searched and that society recognizes this expectation as objectively reasonable,

because "one of the clearest forms of degradation in Western Society is to strip a person of his clothes." *Deserly*, ¶ 19 (quoting *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995)). Further, the searches were not reasonable because the record lacked evidence to support the belief that increased contraband is being brought into the jail through traffic and non-felony offenders or that strip searching these offenders reduces the flow of drugs, weapons, or contraband into the jail.

¶22 Montanan's have a heightened right of privacy given the express inclusion of that right in our state constitution. Mont. Const. art. II, § 10. When a right of privacy is specifically implicated as part of a traditional search and seizure analysis, we address Article II, Section 10, of the Montana Constitution in conjunction with Article II, Section 11, of the Montana Constitution. *Deserly*, ¶ 15; *State v. Goetz*, 2008 MT 296, ¶ 14, 345 Mont. 421, 191 P.3d 489. "In light of the constitutional right to privacy to which Montanans are entitled, we have held that the range of warrantless searches which may be lawfully conducted under the Montana Constitution is narrower than the corresponding range of searches that may be lawfully conducted pursuant to the federal Fourth Amendment." *State v. Hardaway*, 2001 MT 252, ¶ 35, 307 Mont. 139, 36 P.3d 900.

¶23 To determine whether there has been an unlawful governmental intrusion into one's privacy in search and seizure situations, we consider three factors: "(1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion." *Deserly*, ¶ 16.

> The first two factors are considered in determining whether a search or seizure occurred, thus triggering the protections of Article II, Sections 10 and 11. The third factor relates to the reasonableness of the search or seizure under the circumstances. Under the third factor, we determine whether the state action complained of violated the Article II, Section 10 and 11 protections because it was not justified by a compelling state interest or was undertaken without procedural safeguards such as a properly issued search warrant or other special circumstances.

*Goetz*, ¶ 27.

¶24 As the Plaintiffs point out, this Court recognized in *Deserly* that "one of the clearest forms of degradation in Western Society is to strip a person of his clothes" and "the strip search of an individual by government officials, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Deserly*, ¶ 19 (quoting *Hayes*, 70 F.3d at 1146 and *Romo v. Champion*, 46 F.3d 1013, 1019 (10th Cir. 1995) (internal quotations omitted)). A person has a reasonable expectation of privacy to not be strip searched by government officials and society recognizes that expectation as objectively reasonable. Thus, the District Court erred in holding that no search occurs when detention officers strip search detainees prior to housing them in the general population of the detention facility.

¶25 The analysis does not end there, however. The Montana Constitution protects individuals from *unreasonable* searches and seizures. We must turn to the third factor—the nature of the State's intrusion. While under Montana law a search conducted without a search warrant is per se unreasonable, a warrantless search may, nonetheless, be reasonable when an individual has a diminished expectation of privacy. *Spady*, ¶ 26. Under those circumstances, a court must "balance the privacy-related and law

15

enforcement-related concerns to determine if the intrusion was reasonable." *Spady*, ¶ 28

(quoting *Maryland v. King*, 569 U.S. 435, 463, 133 S. Ct. 1958, 1979 (2013)). "An

individual taken into police custody has a diminished expectation of privacy." *Spady*, ¶ 27;

*see also Worden v. Mont. Bd. of Pardons & Parole*, 1998 MT 168, ¶¶ 33, 35, 289 Mont.

459, 962 P.2d 1157 ("[T]he rights of . . . [i]nmates under the Montana Constitution may be

limited by legitimate, penological interests . . . . [T]he right to privacy, although not

completely lost, may be substantially limited.").

¶26    In *Deserly*, this Court noted "the government has a necessary and legitimate need

to protect the security of those working, visiting, and residing in [penal] institution[s] from

the introduction of contraband." *Deserly*, ¶ 26. Detention officers have a compelling

interest to protect the health and safety of detainees and staff. The government's interest

in security does not turn on whether the arrested person has been charged with a minor,

nonviolent offense, but rather whether the individual has been classified for general jail

population detainment.[2] While we do not march in lockstep with the federal courts in

interpreting whether searches and seizures are reasonable under the Montana Constitution,

we agree with the United States Supreme Court that "[m]aintaining safety and order at

---

[2] The parties did not raise, and we do not address whether under certain circumstances housing a person detained for a traffic or other minor offense in the general population of the detention center could constitute an unreasonable seizure. As Justice Alito explained in his concurrence in *Florence*, "the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population" and for "those arrested for minor offenses . . . admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible." *Florence*, 566 U.S. at 341-42, 132 S. Ct. at 1524 (Alito, J., concurring).

16

these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence*, 566 U.S. at 326, 132 S. Ct. at 1515. "[A] regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'" *Florence*, 566 U.S. at 326, 132 S. Ct. at 1515 (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987)).

¶27    The parties in this case do not dispute that contraband and weapons are a perennial issue at the detention center and that contraband and weapons can at times be brought into the facility secreted away on a detainee's person.  Nor do the parties dispute the detention center has an obligation to prevent detainees from bringing weapons or other contraband into the secure housing area of the facility and to identify any wounds, tattoos, or other visible artifacts which might affect individual safe placement.  Plaintiffs have not demonstrated the strip searches at issue are not reasonably related to these legitimate penological interests or that their diminished expectation of privacy before being housed in the general population of the detention facility outweighs that interest such that the Montana Constitution prohibits the practice.  Given our heightened right to privacy in Montana, we must carefully consider the balance between an individual's privacy interest and the penological interest.  The Plaintiffs contest the detention center's blanket policy, but do not challenge specific practices.[3]    Under these circumstances, the Plaintiffs

---

[3] The Plaintiffs do not raise specific instances of officers engaging in intentional humiliation or other abusive practices.  This issue is not implicated by the facts of this case and we do not consider it here.

diminished privacy interests do not outweigh the legitimate penological interests of the Detention Center. Although we disagree with the District Court's analysis, we affirm its decision.

¶28    *2. Whether the Detention Center's policy to strip search a detainee arrested for traffic or non-felony offenses prior to placement in the general population of the facility without reasonable suspicion to believe that person is concealing a weapon, contraband, or evidence of the commission of a crime violates § 46-5-105, MCA.*

¶29    The District Court determined § 46-5-105, MCA, was a codification of the United States Supreme Court decision in *Florence*, explaining the statute "is consistent with, and reinforces, *Florence*'s limited holding in that individuals arrested for misdemeanor offenses may not be strip searched without reasonable suspicion if they are not placed in general custody." The court explained: "No where in the statute did the 2013 Legislature provide that the 'reasonable suspicion requirement before the strip search' be applied before an individual is placed in a Montana's [sic] penal institution's general population or general custody." The court determined this interpretation harmonizes § 46-5-105, MCA, with § 46-5-101(2), MCA. Section 46-5-101(2), MCA, allows for warrantless searches in accordance with judicially recognized exceptions to the warrant requirement. The court reasoned that *Florence* provides such a judicially recognized exception to the warrant requirement for detainees entering the general population of a detention center, authorizing the strip searches at issue here under § 46-5-101(2), MCA, while § 46-5-105, MCA, clarifies that outside the context of entering the general population of a detention center, reasonable suspicion is required to conduct a strip search of a person detained or arrested for a minor offense.

18

¶30 Plaintiffs argue on appeal the District Court's ignored the plain language of § 46-5-105, MCA, and inserted language to create a judicial exception to the prohibition on strip searches of detainees arrested for traffic or minor offenses entering the general population of a detention facility. Plaintiffs maintain § 46-5-105, MCA, statutorily abrogated the decision in *Florence* and prohibited strip searches of individuals "arrested or detained for a traffic offense or an offense that is not a felony" before they are placed in the general population of a jail unless there is reasonable suspicion to believe that person is concealing a weapon, contraband, or evidence of the commission of a crime. The Plaintiffs further highlight the legislative history of § 46-5-105, MCA, during the 2013 and 2019 legislative sessions, which supports such a plain language interpretation of the statute: In 2013 when the statute was originally enacted, discussions during committee hearings and on the floor of the House and Senate focused on the need to statutorily prohibit strip searches of detainees charged with traffic or other minor crimes who are arrested and brought to jail pending bail or a court appearance. Legislators voiced concerns that strip searches of such detainees could occur without reasonable suspicion a detainee was concealing a weapon, contraband, or evidence of the commission of a crime under the United State Supreme Court decision in *Florence*, because the Supreme Court held such searches did not violate a detainee's Fourth Amendment rights. Second, in 2019, the Legislature rejected a proposal to amend § 45-6-105, MCA, to expressly include an exception from the statutory prohibition for detainees who will be housed in the general population of a detention facility.

19

¶31   This case requires the Court to determine whether § 46-5-105, MCA, prohibits detention center employees who are booking a person into the general population of a detention facility from conducting a visual body cavity search without reasonable suspicion to believe that person is concealing a weapon, contraband, or evidence of the commission of a crime. Our objective when interpreting a statute is to implement the objectives the legislature sought to achieve. *Mont. Vending, Inc. v. Coca-Cola Bottling Co. of Mont.*, 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499. We ascertain the Legislature's intent, in the first instance, from the plain language of the statute. *See Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003; *Mont. Vending, Inc.*, ¶ 21. "If the intent of the legislature can be determined from the plain meaning of the words used in the statute, the plain meaning controls, and this Court need go no further nor apply any other means of interpretation." *Mont. Vending, Inc.*, ¶ 21. We examine legislative history only when the intent cannot be ascertained from the language of the statute. *Mont. Vending, Inc.*, ¶ 21.

¶32   "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We interpret a statute by reading it as a whole, "without isolating specific terms from the context in which they are used by the Legislature." *Mont. Sports Shooting Ass'n*, ¶ 11 (quoting *City of Great Falls v. Morris*, 2006 MT 93, ¶ 19, 332 Mont. 85, 134 P.3d 692). "We must harmonize statutes relating to the same subject, as much as possible, giving effect to each." *Mont.*

20

*Sports Shooting Ass'n*, ¶ 11.  When interpreting a statute, we must presume the Legislature would not pass useless or meaningless legislation, but rather intended to make some change in existing law by enacting the statute.  *Mont. Sports Shooting Ass'n*, ¶ 15.

¶33     Section 46-5-105, MCA, states:

> A person arrested or detained for a traffic offense or an offense that is not a felony may not be subjected to a strip search or a body cavity search by a peace officer or law enforcement employee unless there is reasonable suspicion to believe the person is concealing a weapon, contraband, or evidence of the commission of a crime.

The statute's prohibition on suspicionless strip searches is unambiguous.  The statute provides "a peace officer or law enforcement employee" may not conduct suspicionless strip searches on a person "detained for a traffic offense or an offense that is not a felony." There is no exception provided in the plain text of the statute to the prohibition on suspicionless strip searches of persons detained for traffic or minor offenses.  Rather, the statute is clear, officers and law enforcement employees must have "reasonable suspicion to believe the person is concealing a weapon, contraband, or evidence of the commission of a crime" to conduct a strip search of a person detained for traffic or minor offenses.  The Defendants admit the detention officers are "law enforcement employees" under the statute.  The District Court determined the statute does not expressly apply to a detainee being placed in the general population of a detention facility.  But the statute does not need to state such.  *See* § 1-2-101, MCA.  The plain language unequivocally prohibits suspicionless strip searches of those arrested for minor offenses in any situation.  There is no provision that allows officers to strip search without suspicion the covered low-level

21

offenders if they are placed in the general jail population. The *Florence* Court explained, "[i]ndividual jurisdictions can of course choose to impose more restrictive safeguards through statutes." *Florence*, 566 U.S. at 338, 132 S. Ct. at 1522 (internal quotations omitted). The Legislature enacted such a more restrictive safeguard with § 46-5-105, MCA.

¶34 Further, this Court "must presume in construing these statutes that the Legislature intended to make some change in existing law by passing it." *Mont. Sports Shooting Ass'n*, ¶ 15. In *Florence*, the United States Supreme Court held the Fourth Amendment does not require the State to have reasonable suspicion to believe a detainee is carrying a weapon or contraband in order to strip search the detainee before placing him or her in the general population of a detention facility. After *Florence* such searches were permissible under the federal constitution and presumably permissible under § 46-5-101(2), MCA, as a judicially recognized exception to the warrant requirement. The passage of § 46-5-105, MCA, statutorily abrogated this judicially recognized exception and imposed more restrictive safeguards on officers in this State. Because the plain language of the statute on this issue is unambiguous, we do not examine the legislative history of the statute. The District Court's interpretation of the statute was in error. We reverse and remand the grant of summary judgment to the Defendants on this issue.

**CONCLUSION**

¶35     The District Court's order is affirmed in part and reversed in part and remanded for further proceedings consistent with this Opinion.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR