ATTORNEY FOR APPELLANT

Michael C. Borschel
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana



FILED

Nov 06 2020, 8:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

Stephanie J. Reagan,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 6, 2020

Court of Appeals Case No.
20A-CR-907

Appeal from the Marion Superior
Court

The Honorable Charnette D. Garner,
Judge

The Honorable Ronnie Huerta,
Magistrate

Trial Court Cause No.
49G09-1806-F6-18536

**Bailey, Judge.**

# Case Summary

[1] Following a jury trial, Stephanie J. Reagan ("Reagan") was convicted of—*inter alia*—Possession of Cocaine[1] based on cocaine found during a warrantless strip search. Reagan challenges the admission of the evidence of cocaine, arguing that the strip search violated Article 1, Section 11 of the Indiana Constitution.

[2] We affirm.

# Facts and Procedural History

[3] Around 8:16 p.m. on June 8, 2018, Reagan was driving a vehicle with her child in the backseat. At an intersection, Reagan's vehicle collided with a vehicle driven by Deputy Darrius Austin ("Deputy Austin") of the Marion County Sheriff's Office, who was off duty. Deputy Austin noticed an odor of burnt marijuana emanating from Reagan's vehicle. Approximately ten minutes after the collision, Lieutenant Doug Smith ("Lieutenant Smith") and Deputy Kelli Kingen ("Deputy Kingen") of the Marion County Sheriff's Office arrived. Deputy Kingen approached Reagan, who was holding the child. Reagan gave Deputy Kingen permission to retrieve the vehicle's registration from the glovebox. At that time, Deputy Kingen thought that Reagan seemed nervous, but no more nervous than a typical person involved in a vehicle collision.

---

[1] Ind. Code § 35-48-4-6(a).

[4] Deputy Kingen then entered Reagan's vehicle. Deputy Kingen noticed an odor of marijuana inside the vehicle and observed what appeared to be a marijuana blunt on the floorboard. Deputy Kingen relayed her observations to Lieutenant Smith, and Deputy Austin stated that he also noticed the odor of marijuana. As the investigation progressed, Reagan's demeanor changed to the point that Deputy Kingen became worried for the child's safety and asked to hold the child. Reagan had "become more agitated, nervous, started pacing a little bit." Tr. Vol. II at 140. Deputy Kingen was concerned that Reagan would run away.

[5] Deputy Kingen conducted a pat-down search to locate weapons and did not find any weapons. At some point, Reagan received *Miranda* warnings, after which she admitted to smoking marijuana before driving. Reagan refused a chemical test, which led to a search warrant authorizing a blood draw. Reagan was arrested for allegedly Operating a Vehicle While Intoxicated ("OVWI"). Reagan was transported to a hospital where a blood draw was conducted. Reagan was then transported to the Arrestee Processing Center in Marion County, where Deputy Joana Jimenez ("Deputy Jimenez") was working.

[6] Deputy Jimenez noticed that Reagan was "fidgety," *id.* at 149, shaking her leg, trying to engage in small talk, and looking around the room. Deputy Jimenez thought that Reagan's behavior was unusual because arrestees "do not usually talk to [her] or want to talk to [her] while [she is] patting them or searching them unless they have . . . questions about processing or their charge[.]" *Id.* at 154. Deputy Jimenez was aware that Reagan had been arrested for OVWI. Based on Deputy Jimenez's experience processing arrestees and based on

Reagan's demeanor that evening, Deputy Jimenez felt that something was amiss. Although Deputy Jimenez initially planned to conduct a pat-down search of Reagan, Deputy Jimenez decided to conduct a strip search. During the ensuing strip search of Reagan, Deputy Jimenez found a small baggie stuck to Reagan's breast. Reagan asked if Deputy Jimenez could "get rid of it" and Deputy Jimenez said no. *Id.* at 166. The baggie contained a powdery substance that Deputy Jimenez suspected was cocaine.

[7] Laboratory testing showed that the baggie contained .1502 grams of cocaine and that the object found in the vehicle contained .2553 grams of marijuana. Reagan's blood sample tested positive for cocaine and a metabolite of cocaine.

[8] Reagan was eventually brought to trial on charges of (1) OVWI, as a Level 6 felony;[2] (2) Possession of Cocaine, as a Level 6 felony; (3) Possession of Marijuana, as a Class B misdemeanor;[3] and (4) Operating a Vehicle with a Schedule II Controlled Substance or its Metabolite in the Body, as a Class C misdemeanor.[4] At trial, Reagan orally moved to suppress evidence obtained from the strip search. Following a hearing outside the presence of the jury, the trial court denied the motion. The trial resumed with a continuing objection

---

[2] I.C. §§ 9-30-5-2(b) & -3(a)(2).

[3] I.C. § 35-48-4-11(a)(1).

[4] I.C. § 9-30-5-1(c).

entered as to evidence obtained from the strip search. The jury eventually found Reagan not guilty of OVWI and guilty of the remaining counts.

[9] Following a sentencing hearing, the trial court entered a Class A misdemeanor conviction for Possession of Cocaine, as permitted by Indiana Code Section 35-50-2-7(c). The court ultimately imposed an aggregate term of 140 days in jail.

[10] Reagan now appeals.

# Discussion and Decision

[11] According to Reagan, the trial court should have granted the oral motion to suppress because the warrantless strip search violated Article 1, Section 11 of the Indiana Constitution. However, because Reagan is appealing after a completed trial, the issue is "best framed as challenging the admission of evidence at trial." *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). In general, we review an evidentiary ruling for an abuse of discretion. *Hardin v. State*, 148 N.E.3d 932, 939 (Ind. 2020). However, "the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Id.* (quoting *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014)).

[12] Article 1, Section 11 of the Indiana Constitution protects against "unreasonable search or seizure[.]" In *Litchfield v. State*, our Supreme Court explained that "[t]he legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." 824 N.E.2d 356, 359 (Ind. 2005). Although there may be

"other relevant considerations under the circumstances," the reasonableness of a particular search or seizure generally "turn[s] on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.* at 361.

[13] On appeal, Reagan expresses uncertainty about whether *Litchfield* controls the constitutionality of strip searches under the Indiana Constitution. Reagan directs us to *State v. Pitchford*, wherein this Court declined to apply *Litchfield* and determined that "[t]he constitutionality of strip searches in Indiana is controlled by . . . *Edwards v. State*, 759 N.E.2d 626 (Ind. 2001)"—a decision that predated *Litchfield*. 60 N.E.3d 1100, 1103 (Ind. Ct. App. 2016), *trans. denied*. The State ultimately maintains that *Litchfield* provides the controlling standard. Even so, the State offers an alternative argument analyzing the search under *Edwards*, which addressed routine, warrantless strip searches of misdemeanor arrestees.

[14] Notably, after this Court's *Pitchford* opinion was handed down, our Supreme Court pointedly explained that *Litchfield* "applies broadly to 'a governmental search'" and is "comprehensive" in its application. *Watkins v. State*, 85 N.E.3d 597, 600 (Ind. 2017) (quoting *Litchfield*, 824 N.E.2d at 359); *see also Hardin*, 148 N.E.3d at 943 (citing *Watkins* with approval). We therefore conclude that *Litchfield* controls the constitutionality of a strip search under Article 1, Section 11 of the Indiana Constitution. Nevertheless, although *Litchfield* provides the controlling standard, *Edwards*—with its specific analysis in the context of strip searches—offers guidance regarding the reasonableness of a strip search under

the totality of the circumstances. *See Litchfield*, 824 N.E.2d at 360-61 (discussing *Edwards* after noting that "the degree of intrusion may render a search unreasonable, even where law enforcement needs are obviously present").[5]

## Degree of Suspicion

[15] We begin by analyzing the "degree of concern, suspicion, or knowledge that a violation has occurred." *Litchfield*, 824 N.E.2d at 361. As our Supreme Court has observed, "[t]he focus of this factor can change slightly depending on the action challenged." *Hardin*, 148 N.E.3d at 944 n.5. To focus our inquiry, we find guidance in our Supreme Court's discussion of suspicion in *Edwards*.

[16] *Edwards* involved the practice of subjecting all misdemeanor arrestees to a warrantless strip search. *See Edwards*, 759 N.E.2d at 628-29. The Court expressed concern about the routine nature of the intrusive search—*i.e.*, where a strip search was conducted without individualized suspicion that the arrestee was concealing contraband. *Id.* at 629. Our Supreme Court ultimately declared the routine practice unconstitutional under Article 1, Section 11 of the Indiana Constitution, noting that, "[t]o the extent a search is conducted on the basis of jail security, the indignity and personal invasion necessarily accompanying a strip search is simply not reasonable without the reasonable suspicion that weapons or contraband may be introduced into the jail." *Id.* at 630.

---

[5] Thus, we consider the parties' arguments under *Edwards* only to the extent they bear on the *Litchfield* test.

[17] Although the *Litchfield* test replaced the standard of "reasonable suspicion," the *Edwards* Court nevertheless identified two sources of individualized suspicion that might support a warrantless strip search: (1) "the circumstances surrounding the arrest" and (2) the nature of the alleged criminal conduct. *Id.* As to the latter, where the alleged criminal conduct poses a "reasonable likelihood of discovery of evidence," there is a higher degree of suspicion supporting a strip search. *See id.* at 629 (noting that "false informing, without more, is certainly not such a crime"), 630 ("Some offenses inherently give rise to . . . suspicion that a suspect possesses weapons or contraband.").

[18] Here, Reagan argues that there was a low degree of suspicion supporting the strip search. Reagan points out that she was arrested for a misdemeanor, not a felony. Reagan also focuses on what Deputy Jimenez knew at the time of the search, arguing that Deputy Jimenez merely had a vague feeling that something was wrong. Reagan asserts that a vague feeling—coupled with an arrestee's mere fidgeting and small talk—does not provide a high degree of suspicion.

[19] Although Reagan largely focuses on the actual knowledge of the searching officer, *Edwards* directs that we also consider the circumstances of the arrest and the nature of the allegations underlying the arrest. *See id.*; *see also Hardin*, 148 N.E.2d at 943 (citing with approval a case that examined "the longer chain of interactions between the defendant and law enforcement around the time of the stop and search"). Here, Reagan was arrested for a substance-related offense— OVWI—not a low-level "traffic" offense, as Reagan asserts. The surrounding circumstances include (1) an odor of marijuana emanating from Reagan's

vehicle, (2) a suspected marijuana blunt visible inside the vehicle, and (3) Reagan's admission to smoking marijuana before driving. As the criminal investigation progressed, Reagan displayed increasingly nervous behavior—to the point that Deputy Kingen was concerned for the child Reagan was holding. Reagan also displayed nervous, unusual behavior at the Arrestee Processing Center, which ultimately led Deputy Jimenez to believe something was amiss.

[20] We conclude that these circumstances—*i.e.,* the circumstances of the arrest, the nature of the allegations, and Reagan's ongoing nervous behavior—give rise to a relatively high degree of suspicion that Reagan was concealing contraband. However, even if constrained to consider only the knowledge of the searching officer, we would identify a high degree of suspicion because Deputy Jimenez knew the arrest was for OVWI and observed Reagan's suspicious behavior.

# Degree of Intrusion

[21] Turning to the degree of intrusion, we analyze this factor from "the defendant's point of view," taking into account the degree of intrusion "into both the citizen's physical movements and the citizen's privacy." *Hardin*, 148 N.E.3d at 944. Moreover, we consider the way in which officers conducted the search, including the force used. *See id.* at 945 (giving the example of "using a battering ram, flash-bang grenade, and SWAT team" to execute a search warrant).

[22] Here, Reagan was subjected to a strip search. This type of search is highly intrusive, which generally weighs against the practice. Notably, however, there is no indication that the search was more intrusive than a typical strip search.

That is, there is no indication that Deputy Jimenez prolonged the search or was more forceful than necessary in conducting the search. In any case, we conclude that the instant search necessarily involved a high degree of intrusion.

## Extent of Needs

[23] As to the extent of law-enforcement needs, "we look to the needs of the officers to act in a general way"—*e.g.*, to promote public safety—as well as "the needs of the officers to act in the particular way and at the particular time they did[.]" *Id.* at 946-47. Here, Reagan emphasizes that the police could have obtained a warrant to conduct a strip search. However, under Article 1, Section 11, "[t]he use of a valid warrant does not necessarily result in a search which is reasonable in the constitutional sense, and the failure to use a warrant does not necessarily result in a search which is unreasonable in the constitutional sense." *Brown v. State*, 653 N.E.2d 77, 79 (Ind. 1995). Rather, we remain tasked with evaluating the search under the totality of the circumstances. *See id.* at 79-80.

[24] In general, law enforcement has a strong interest in protecting arrestees and inmates and keeping jails free from contraband. *See Edwards*, 759 N.E.2d at 630; *Edmond v. State*, 951 N.E.2d 585, 592 (Ind. Ct. App. 2011). Without more, this need does not support subjecting all arrestees to a strip search. *See Edwards*, 759 N.E.2d at 630. However, where—as here—there is a high degree of

suspicion that an arrestee is concealing contraband, law enforcement has a strong need to search for contraband during the intake procedures. *See id.*[6]

[25] Reagan baldly suggests that the need to locate contraband is weaker when processing a person arrested for a misdemeanor as opposed to a felony. However, we disagree that the general need to protect those in custody varies based on the level of allegations against a particular arrestee. Moreover, to the extent Reagan argues that police needs were weaker because Deputy Kingen had already conducted a pat-down search, we note that a pat-down search is inherently limited in scope and does not necessarily disclose all contraband. Thus, a pat-down search would not eliminate concerns that have arisen under the circumstances. Next, to the extent Reagan focuses on the lack of a warrant, we note that delaying a strip search could pose harm to a person concealing contraband. Indeed, caselaw in this area has involved drugs—sometimes multiple kinds of drugs—precariously packaged and concealed in an arrestee's body cavity. *See generally, e.g.*, *id.* at 628 (involving a plastic bag concealed in an

---

[6] The dissent suggests that the extent of law-enforcement needs turns on whether an arrestee will eventually reach a jail's general population. The dissent asserts that Reagan was subjected to a strip search "long before it was determined whether she would be sent to the jail or released" after processing. Slip op. at 17. Yet, regardless of Reagan's ultimate destination, the record shows that Reagan was to be placed in a holding cell amid intake procedures. Indeed, Deputy Jimenez testified that arrestees are first searched, "then after that they get thumb printed so that they can be identified . . . then they are moved on to a holding cell so they can . . . get processed, fingerprints, picture, depending on what they need." Tr. Vol. 2 at 149. As Deputy Jimenez explained, law enforcement "do[es] not want inmates to be doing drugs in . . . holding tanks[.]" *Id.* at 146. Ultimately, Reagan was being brought into a controlled environment. The dissent would require additional evidence about the nature of this controlled environment. Yet, as the dissent points out, there is ample evidence that this is a high-volume processing center: "[Deputy Jimenez] testified that the processing center received more than 3,000 detainees in January 2020." Slip op. at 14. All in all, law enforcement has a strong interest in keeping controlled areas free from contraband, ensuring that arrestees do not (1) use drugs or (2) discard drugs that other arrestees—any of whom may reach general population—could conceal or use.

arrestee's buttocks containing 1.12 grams of cocaine); *Pitchford*, 60 N.E.3d at 1103 (involving similar positioning of cocaine and heroin). In any case, even if the police could have expeditiously obtained a search warrant in this case, the lack of a search warrant is not dispositive. *See Brown*, 653 N.E.2d at 79-80.

# Balancing

[26] Ultimately, although the search was highly intrusive, law enforcement had a high degree of suspicion and a strong need to protect Reagan and others in custody. On balance, we conclude that the search was reasonable under the totality of the circumstances. We therefore conclude that the search did not run afoul of Article 1, Section 11 of the Indiana Constitution. Thus, the court did not abuse its discretion in admitting evidence obtained from the strip search.

[27] Affirmed.

Vaidik, J., concurs.

Weissmann, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Stephanie J. Reagan,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana<br>*Appellee-Plaintiff.* | Court of Appeals Case No.<br>20A-CR-907 |

**Weissmann, Judge, dissenting.**

I respectfully dissent. As noted by the majority, *Litchfield v. State* gives us three considerations to balance when assessing the reasonableness of a search under article I, section 11: (1) the degree of concern or suspicion that a violation has occurred; (2) the degree of intrusion of the search or seizure; and (3) the extent of law enforcement needs. 824 N.E.2d at 361. Although *Edwards* was not decided under the *Litchfield* standard, we nevertheless are guided in our *Litchfield* analysis by *Edwards'* holding that a jail strip search is unreasonable without "reasonable suspicion that weapons or contraband may be introduced into the jail." 759 N.E.2d at 630.

First, with respect to Deputy Jimenez's degree of concern or suspicion, the record reveals: (1) she was aware that Reagan had been arrested for misdemeanor operating a vehicle while intoxicated; (2) Reagan was "a little

fidgety"; (3) Reagan "wanted to have [] small talk" with Deputy Jimenez; (4) Deputy Jimenez "felt like [Reagan] needed to be strip searched"; (5) Deputy Jimenez "just [had] a feeling" which she "cannot really describe "; (6) Deputy Jimenez explained that "when an inmate acts in a certain way . . . I just go ahead and strip search them if I need to or have a feeling I am needing to do it." Tr. Vol. II p. 149-51.

[30] The arbitrary nature of Deputy Jimenez's "feeling" is evident from the sheer number of strip searches she conducts while processing those who are arrested, some of whom are not necessarily going to jail. She testified that the processing center received more than 3,000 detainees in January 2020. Tr. Vol. II p. 174. When asked to categorize the strip searches she conducts on detainees charged with operating a vehicle while intoxicated (OVWI) as "frequent," "infrequent," or "somewhere in the middle," Deputy Jimenez chose "somewhere in the middle." Tr. Vol. II p. 155. Although Deputy Jimenez did not elaborate, her testimony reasonably suggests she subjects to strip searches at least thirty to sixty percent of the OVWI detainees she processes in Marion County. Tr. Vol. II p. 174. The record contains no evidence of any restrictions on Deputy Jimenez's discretion in strip search determinations. If Deputy Jimenez had a "feeling", she seemingly could strip search the detainee, regardless of the underlying circumstances. Tr. Vol. II pp. 149-151. In *Edwards*, however, our Supreme Court found "routine, warrantless strip searches of misdemeanor arrestees" were unreasonable under article I, section 11. 759 N.E.2d at 629. The Court specifically determined that "to the extent a search is conducted on

the basis of jail security, the indignity and personal invasion necessarily accompanying a strip search is simply not reasonable without the reasonable suspicion that weapons or contraband may be introduced into the jail." *Id.* at 630.

[31] I simply cannot conclude a person's nervous, talkative manner while being processed for a crime alone is sufficient to create a high enough degree of suspicion—that is, reasonable suspicion—to justify a strip search. It seems to me that being nervous and talkative is an understandable way to behave in a stressful situation. The deputy's inarticulable "feeling" also does not warrant a strip search. The only additional evidence available to Deputy Jimenez to determine whether to execute a strip search was her knowledge that Reagan had been arrested for OVWI. Such knowledge likewise is not enough, alone or in combination with Deputy Jimenez's "feeling," to justify a strip search. To say otherwise would render per se reasonable a strip search of every person being processed for a substance offense, no matter how minor. Our Supreme Court made clear in *Edwards* that such an approach contravenes article I, section 11. 759 N.E.2d at 630. Based on this record, I find the degree of concern or suspicion that the arrestee is secreting contraband was low.

[32] With respect to the second factor, a strip search undeniably involves an extraordinarily high degree of intrusion. I do not agree with the majority that the strip search conducted here is no more intrusive than a typical strip search. Finding the term "strip search" to be "imprecise," the United States Supreme Court has observed:

> It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge which might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

*Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 325 (2012).

[33] During the strip search at issue here, Reagan was required to remove each piece of her clothing until she was nude, face the wall, spread her feet, manually spread her buttocks, and then cough three times (presumably to expel any items from her lower orifices) under the close supervision of Deputy Jimenez. Tr. Vol. II p. 165. Such a strip search is among the most intrusive in the range of strip searches described in *Florence*. Another state appellate court recently observed that "one of the clearest forms of degradation in Western society is to strip a person of his clothes." *Rogers v. Lewis & Clark Cty.*, 472 P.3d 171, 180 (Mont. 2020) (citations omitted). It was sufficiently intrusive to cause this second *Litchfield* factor to weigh heavily in favor of Reagan.

[34] With respect to the third factor, undeniably "law enforcement has a strong interest in protecting arrestees and inmates and keeping jails free from contraband." Slip op. p. 10. In this case, however, I am not persuaded the State established law enforcement needs *for a strip search* were significant. This is

particularly true in light of the seemingly indiscriminate manner in which law enforcement selected Reagan and other arrestees for strip searches.

[35] Deputy Jimenez testified arrestees arrive at intake processing "to get processed, get searched, fingerprinted so they can get a Court date." Tr. Vol. II p. 145. She explained that after they are processed, "[t]hey either get released or they get sent to the jail with a bond. After that they are transported to the jail if they go to the jail or they get released to the streets if they get released [on their own recognizance]." *Id.* Deputy Jimenez testified that she conducted the strip search when Reagan first arrived for processing—long before it was determined whether she would be sent to the jail or released. *Id.* at 149-50.

[36] The majority focuses on Deputy Jimenez's testimony indicating the arrestees are placed in a holding cell after they are searched but before they are processed for release or jail. Tr. Vol. II p. 149. The majority relies on such testimony to suggest a significant need by law enforcement to strip search arrestees to ensure the arrestees do not consume or share drugs during processing in a "controlled environment." However, the State presented little evidence of the nature of the holding cells.

[37] For instance, the record does not reveal whether the arrestees were placed in individual or group holding cells, if the arrestees were observed continuously while in the holding cell(s), or the length of time the arrestees were left in the holding cell(s). Such details would be critical in assessing the risk of the use or transmission of undetected drugs, but the record is devoid of such evidence. As

the State bore the burden of proof under the *Litchfield* test, this lack of evidence means the State did not establish that strip searches were necessary to protect arrestees by limiting use or sharing of drugs in the holding cell(s). Further, the State presented no evidence suggesting Reagan's demeanor, actions, or offense (OVWI) indicated a cognizable risk she would use or transmit drugs in the holding cell. Even if a "controlled environment" existed at the processing center, as the majority suggests, the law enforcement need for strip searches to regulate contraband at the processing center seemingly would diminish as the level of control over arrestees increases.

[38] I certainly agree that during this process, a pat-down search was proper. But I cannot conclude law enforcement needs necessitated a strip search at this point—well before it was known whether Reagan actually would be taken to the jail with the potential to introduce contraband into that environment and without any evidence that her placement in a holding cell posed a risk she would use or share drugs while in the holding cell.

[39] Reagan does not challenge the search under the Fourth Amendment to the United States Constitution, but Fourth Amendment analysis is helpful in this context. In *Florence,* the United States Supreme Court ruled jail administrators may require all arrestees committed to the general population of a jail to undergo visual strip searches not involving physical contact by corrections officers. 566 U.S. at 334-339. However, the majority of the Court recognized possible "legitimate concerns about the invasiveness of searches that involve the touching of detainees" held without assignment to the general jail population

and without substantial contact with other detainees. 566 U.S. at 338-339. The Court specifically noted that "[t]he accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue." *Id.* at 339.

[40] Even the concurring opinions in *Florence* focused on distinguishing the holding in that case from scenarios in which the detainee is not held in the general jail population. *Id.* at 340 (Roberts, C.J., concurring); *Id.* at 340-341 (Alito, J., concurring). Such a distinction appears appropriate under an article I, section 11 analysis, as well, given Litchfield's required consideration of the degree of suspicion, level of intrusion, and law enforcement needs. 824 N.E.2d at 361.

[41] This is where the majority and I respectfully part. I would distinguish between strip searches of: 1) misdemeanor arrestees likely to be released from the processing center whom the State has not shown, through specific evidence of the accommodations and/or the particular arrestee's behavior or characteristics, to be at risk to use or transmit drugs or weapons while in custody; and 2) arrestees likely to be introduced to the general jail population. [7]

---

[7] Some states have avoided parts of this conundrum by enacting statutes which prohibit strip searches under certain circumstances. See, e.g., Mo. Rev. Stat. § 544.193.2 (2014) ("No person arrested or detained for a traffic offense or an offense which does not constitute a felony may be subject to a strip search or a body cavity search ... unless there is probable cause to believe that such person is concealing a weapon ... or contraband"); Kan. Stat. Ann. § 22–2521(a) (similar); 725 Ill. Comp. Stat., ch. 725, § 5/103–1(c) (West 2016) (similar but requiring "reasonable belief"); 501 Ky. Admin. Regs. 3:120, § 3(1)(b) (2017) (similar but requiring "reasonable suspicion"); Tenn. Code Ann. § 40–7–119 (2019) (similar but requiring "reasonable belief"); Colo.Rev.Stat. Ann. § 16–3–405(1) (2011) (no strip search absent individualized suspicion unless person has been arraigned and court orders that suspect be detained); Fla. Stat. § 901.211(2) (2010) (requiring

[42] Under these circumstances, I believe application of the *Litchfield* test compels a conclusion that the State failed to meet its burden of establishing this strip search was reasonable under article I, section 11 under the totality of the circumstances. *See Hardin v. State*, 148 N.E.3d 932, 943-944 (Ind. 2020) (finding *Litchfield* provides the framework for conducting the totality of the circumstances analysis necessary to determine the constitutionality of a search under article I, section 11). In my opinion, we should reverse the judgment based on the admission of this evidence and remand for further proceedings. Therefore, I respectfully dissent.

---

"probable cause"); Mich. Comp. Laws Ann. § 764.25a(2) (West 2020) (requiring "reasonable cause"); Wash. Rev.Code § 10.79.130(1) (West 2020) (requiring "reasonable suspicion").